**James M. SPEYER et al., Appellants,**

v.

**Marion S. BARRY, Jr. et al., Appellees.**

**No. 88–958.**

District of Columbia Court of Appeals.

Argued Jan. 24, 1990.

Decided March 29, 1991.

Steven M. Schneebaum, with whom Martha M. Kendrick and Dean M. Dilley, Washington, D.C., were on the brief, for appellants.

Ann O'Regan Keary, Deputy Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corp. Counsel, and Sheila Kaplan, Washington, D.C., Asst. Corp. Counsel, were on the brief, for appellees.

Before FERREN, BELSON and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

Two residents of Georgetown and a Georgetown citizens' association (the Georgetown residents) brought this action against the District of Columbia and several of its officials (collectively the District) to prevent the conversion of certain property, heretofore known as the Hurt Home and located at 3050 R Street, N.W., into a residential treatment center for emotionally disturbed children. On this appeal from an award of summary judgment in favor of the District on most of the claims, two broad issues are presented. The first of these issues is whether District of Columbia laws regulating the use of real property —specifically, zoning, certificate of occupancy, and historic preservation laws—apply to the District of Columbia government. The second principal question is whether the Saint Elizabeths Hospital and District of Columbia Mental Health Services Act, D.C.Code §§ 32–621 to –628 (1988), *as amended,*[1] (the Mental Health Services Act or MHSA), with which the District has complied in attempting to establish the center, has implicitly superseded the District of Columbia Certificate of Need Act of 1980, as amended, *id.* §§ 32–301 to –317 (1988 & 1989 Supp.) (the Certificate of Need Act or CONA), which governs the establishment of any "new institutional health service" by any "person," including the District government, with which the District has not complied. With regard to the second issue, we must also address the District's contention, made for the first time in a supplemental brief filed after the court raised the point *sua sponte* at argument, that the Georgetown residents lack standing to assert a CONA violation.

We conclude that on May 23, 1990, the effective date of a specific statute addressing the first issue, the District became subject to the provisions of the Zoning Regulations, which are codified in Title 11 of the District of Columbia Municipal Regulations (1987), as amended. The District had not yet begun operations at the center by May 23, and had not yet executed an agreement

---

1. See the Commission on Mental Health Services Employees Retention Amendment Act of 1989, D.C.Law 8–40, § 2, 36 D.C.Reg. 5756, 5756 (Notice of Nov. 3, 1989, 36 D.C.Reg. 7535).

with the contractor, although much planning and preparatory work had been done. Under the applicable case law, the District must seek a variance or special exception for the property, or the rezoning of the district in which it is located, and must also apply for a new certificate of occupancy, unless it can show that manifest injustice would result if it were compelled to comply with these provisions. As an appellate tribunal, we are not in a position to make the necessary findings with regard to manifest injustice. Accordingly, we remand to the trial court for a determination of that issue.

We also hold that the District must apply for and receive the statutorily required certificate of need before it can operate the proposed center. We conclude that the Georgetown residents have standing to assert the CONA claim, and we cannot agree with the District's argument that the Mental Health Services Act effected a *pro tanto* implied repeal of the CONA.

Accordingly, we affirm in part, reverse in part, and vacate in part the award of summary judgment to the District and remand for further proceedings.

# I

## BACKGROUND

Enacted by Congress in 1984, the Mental Health Services Act requires the Mayor, in consultation with officials of Saint Elizabeths Hospital and representatives of affected employee organizations, to establish by October 1, 1991, "a comprehensive District mental health system to provide mental health services and programs through community mental health facilities to individuals in the District of Columbia." D.C. Code § 32-623(a)(2) (1988). In 1986, in conformity with this enactment, the Mayor submitted a "preliminary system implementation plan" to the Council of the District of Columbia. After receiving the Council's comments, *see* Resolution 6-566, 33 D.C. Reg. 1579 (1986), the Mayor proposed a "revised preliminary system implementation plan" to the House Committee on the District of Columbia, the Senate Committee on Labor and Human Resources, and the Senate Committee on Governmental Affairs. *See* D.C.Code §§ 32-623(b)(1), (2), 32-624 (1988). Later that year, the Mayor submitted a "final system implementation plan" to the Council for further review. *See* Resolution 6-950, 34 D.C.Reg. 179 (1987). He then presented the same plan to the congressional committees listed above. *See* D.C.Code §§ 32-623(b)(4), 32-624 (1988).

Among other things, the mayor's "final plan" called for the establishment of a residential treatment facility within the District of Columbia to serve twenty-four "severely emotionally or behaviorally disturbed adolescents" by fiscal year 1988. The Hurt Home had not then been acquired by the District, and it was not identified in the final plan.

On August 28, 1987, the Department of Human Services (DHS) announced its intention, in accordance with the final plan, to establish at 3050 R Street, N.W. a "Residential Treatment Center for 24 children, ages 13 to 18, who have emotional problems, and a Special Education Program for 25 students who will be bused in daily." Notice of August 28, 1987, 34 D.C.Reg. 5641. On September 9, 1987, the owners of the property, The Aid Association for the Blind of the District of Columbia and The Henry and Annie Hurt Home for the Blind, contracted to sell the property to the District for $2.9 million. The property, which, as its name indicates, had formerly been a home for the blind, was conveyed to the District by deed on September 16, 1987. According to the affidavit of Dr. Robert A. Washington, Commissioner of Mental Health Services, however, renovations of the property would be required before it could be converted to its contemplated use.

Not everybody in Georgetown was delighted by the prospect of having a new and different group of neighbors. On December 9, 1987, the Georgetown residents filed a nine-count complaint against the District and the former owners of the Hurt

Home[2] in our Superior Court.[3] They alleged that the opening of the proposed center would violate the CONA, various zoning laws and regulations, the certificate of occupancy law, D.C.Code § 5–426 (1988), the Old Georgetown Act, *id.* §§ 5–1101 to –1107, the National Capital Planning Commission (NCPC) statute, *id.* §§ 1–2001 to –2011 (1987), the District of Columbia Administrative Procedure Act (the DCAPA), *id.* §§ 1–1501 to –1511 (1987 & 1989 Supp.) and the public parks law, *id.* §§ 8–101 to –166 (1989). The Georgetown residents further alleged that Dr. Washington had acted *ultra vires* in announcing the acquisition and alteration of the Hurt Home, and that the proposed center would constitute a common law nuisance for the residents of Georgetown and would prevent their use of and access to Montrose Park, which is located nearby.[4] They requested declaratory and injunctive relief against the opening of the center unless and until the District complied with these statutes. In the alternative, they prayed for an injunction barring the opening of the center as a public nuisance. The District subsequently moved for summary judgment on all

counts. The Georgetown residents filed a cross-motion for summary judgment on the CONA, land use and NCPC issues, and opposed the District's motion for summary judgment on the remaining counts.

On June 23, 1988, Judge Frederick H. Weisberg issued a written opinion in which he granted summary judgment in favor of the District on all issues with the exception of the NCPC count, with respect to which he entered summary judgment for the Georgetown residents. The judge held that the District may not proceed to develop the property without first submitting the plans to the NCPC and receiving and considering that agency's views and recommendations. The Georgetown residents now appeal from the award of summary judgment in the District's favor on the zoning and Certificate of Need Act issues.[5]

## II

## LAND USE ISSUES

### A. General Considerations.

Three different sets of land use laws apply to the Hurt Home property and are

---

**2.** The complaint was subsequently dismissed without prejudice as against the former owners.

**3.** The Georgetown residents originally filed their complaint in the United States District Court for the District of Columbia. On October 5, 1987, that court found that local issues predominated and dismissed the suit without prejudice.

**4.** Appellants claim that "[b]y proposing to use Montrose Park as a recreational area for residents of the Hurt Home, the District Government will deprive plaintiffs and other Georgetown residents of the enjoyment of the Park." This contention brings to mind the case of *Nucleus of Chicago Homeowners Ass'n v. Lynn,* 524 F.2d 225, 228–29 (7th Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976), in which the court rejected a neighborhood organization's argument that the prospective residents of public housing would in effect pollute the plaintiffs' middle-class neighborhood and that an environmental impact statement was therefore required.

**5.** The Georgetown residents have also appealed from the award of summary judgment on their DCAPA-based claim, in which they alleged that they were denied their right to a hearing in a "contested case." A hearing before the District of Columbia State Health Planning and Devel-

opment Agency, which considers Certificate of Need applications, *see* D.C.Code § 32–304 (1988), along with a subsequent appeal to the Board of Appeals and Review, *see id.* § 32–309, and a hearing before the Board of Zoning Adjustment or the Zoning Commission with respect to the zoning issues, *see id.* §§ 5–415, –424, would satisfy the requirements of the DCAPA, and the Georgetown residents do not argue to the contrary. The DCAPA issue is therefore essentially subsumed by the Certificate of Need Act and zoning issues.

In opposing the District's motion for summary judgment on the DCAPA issue, the Georgetown residents alleged for the first time that the purchase and proposed use of the Hurt Home constituted "rulemaking" within the meaning of D.C.Code § 1–1506 (1987). The trial judge declined to rule on this contention since the residents had not raised it in their complaint. We agree with his approach and likewise will not address this issue, *see District of Columbia v. Gray,* 452 A.2d 962, 964 (D.C.1982), except to observe that the Georgetown residents' contention is significantly at variance with the ordinary meaning of the term "rulemaking." *See District of Columbia v. North Washington Neighbors, Inc.,* 367 A.2d 143, 147 (D.C.1977), *cert. denied,* 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977).

at issue in this appeal: zoning, certificate of occupancy, and historic preservation. We briefly summarize each.

The Hurt Home, which has been operated as a home for blind adults since at least 1939, is located in a residential district zoned R–1. Under existing zoning regulations, a "[c]ommunity-based residential facility" for more than eight persons is not permitted without the approval of the Board of Zoning Adjustment (BZA). 11 DCMR §§ 201, 217, 218, *as amended by* Notice of Final Rulemaking, Case No. 84–10, 36 D.C.Reg. 1509, 1511–14 (1989). A community-based residential facility is one designed "for persons who have a common need for treatment, rehabilitation, assistance, or supervision in their daily living" (including a "[c]ommunity residence facility," [6] a "[h]ealth care facility," [7] and a "[y]outh residential care home." [8] 11 DCMR § 199.9, at 1–13 to –14 (1987)). The District does not contend that the proposed center is beyond this definition.

The current certificate of occupancy for the Hurt Home limits its permitted use to a community residence facility for up to fifteen residents.[9] Existing regulations provide that "no person shall use any structure, land, or part of any structure or land for any purpose other than a one-family dwelling until a certificate of occupancy has been issued." *Id.* § 3203.1. Finally, the Old Georgetown Act provides that the Mayor may not issue a permit for the "construction, alteration, reconstruction, or razing" of any building within the "Old Georgetown District" [10] without first referring the plans to the National Commission of Fine Arts. *See* D.C.Code § 5–1102 (1988).

### B. *The Trial Court's Decision.*

Relying on the general rule that a municipality exercising a governmental function is not bound by its own zoning laws and regulations unless the legislature has manifested a contrary intent, the trial judge

plied for and received the required BZA approval. The District argues that its proposed use of the property is "consistent" with the property's past use and thus will be in compliance with the zoning laws, even assuming it is bound by them. Although there is authority to the effect that a variance runs with the land, 6 P. ROHAN, ZONING AND LAND USE CONTROLS § 43.02[6][c][*ii*], at 43–65 to –66 (1987), the terms of the Hurt Home's use variance, if one exists, are not contained in the record.

Moreover, the former owners would not have needed a variance if the property's nonconforming use had continued since 1958 without more than a three-year interruption. *See* 11 DCMR §§ 2000.4, 2005.1 (1987). As indicated, the Home has operated since at least 1939, and nothing in the record suggests there has been a significant interruption. The regulations provide that "[a] nonconforming use of land, or of land with structures incidental to the use of the land, shall neither be extended in land area or *changed to any use* except a use permitted." *Id.* § 2000.6 (emphasis added).

The trial judge held that the District was not subject to zoning and certificate of occupancy laws, and therefore did not reach these issues. In light of the legislation enacted since his decision, see pages 1153 to 1155 *infra*, this is no longer true, and it may be necessary to address them on remand.

---

6. A community residence facility is

   a facility providing safe, hygienic sheltered living arrangements for one (1) or more individuals aged eighteen (18) years or older (except that, in the case of group homes for mentally retarded persons, no minimum age limitation shall apply), not related by blood or marriage to the residence director, who are ambulatory and able to perform the activities of daily living with minimal assistance.

   22 DCMR § 3099.1, at 30–22 (1986), *cited in* 11 DCMR § 199.9, at 1–13 (1987).

7. A health care facility is

   a residential facility providing medical or non-medical services consistent with accepted professional, therapeutic medical care concepts and practices, as well as current health programs and legislation.

   22 DCMR § 3099.1, at 30–23 (1986), *cited in* 11 DCMR § 199.9, at 1–13 (1987).

8. A youth residential care home is

   a facility providing safe, hygienic, sheltered living arrangements for one (1) or more individuals less than eighteen (18) years of age, not related by blood, adoption, or marriage to the operator of the facility, who are ambulatory and able to perform the activities of daily living with minimal assistance.

   11 DCMR § 199.9, at 1–14 (1987).

9. The disparity between the Hurt Home's certificate of occupancy and the cited zoning regulations suggests the possibility that at some point the former owners of the Home may have ap-

10. The District does not dispute that the Hurt Home is within the Old Georgetown District. *See* D.C.Code § 5–1101 (1988).

held that the District need not secure a zoning variance or apply to have the area rezoned. He rejected the Georgetown residents' argument that the District government was covered by the zoning laws by the negative implication of D.C.Code § 1–2004(c) (1987), which extends the federal government's exemption from local zoning laws, *see id.* § 5–432, to the District of Columbia government with regard to buildings erected in the "central area" [11] of the District. Noting that the certificate of occupancy requirement is "one of the means through which the District enforces its zoning laws and regulations," the judge went on to hold that the District was also exempt from the certificate of occupancy law. Finally, observing that the "enforcement mechanism" of the Old Georgetown Act is the issuance of a building permit, and that the requirement of a building permit "is in the very same section of the zoning laws as the requirement of obtaining a certificate of occupancy," the judge held that the District's exemption from its own zoning requirements protected it from the reach of the Old Georgetown Act.[12]

---

11. There is no dispute that the Hurt Home is located outside the central area. *See* Zoning Commission Order No. 386, 30 D.C.Reg. 385, 388 (1983).

12. Judge Weisberg analyzed the land use issues as follows:

> A municipality is not bound by its own zoning laws and regulations in the exercise of a governmental function unless the legislature has manifested a contrary intent. *See e.g., Clark v. Town of Estes Park,* 654 P.2d 855 (Colo.Ct.App.1982); *Nehrbas v. Incorporated Village of Lloyd Harbor,* 2 N.Y.2d 190, 140 N.E.2d 241, 159 N.Y.S.2d 145 (1957); 8 E. McQuillin, Municipal Corporations § 25–15 (3rd ed. rev. 1983). Neither the District's zoning statutes, D.C.Code § 5–401 *et seq.* (1981), nor the regulations promulgated thereunder, D.C. Mun.Regs. tit. 11 (1987), provide that District-owned property is subject to the zoning restrictions applicable to private landowners.
>
> Plaintiffs argue that the zoning laws are applicable to District-owned property by negative implication. Plaintiffs point out that D.C. Code § 5–432 exempts federal public buildings from the District's zoning laws and regulations and that D.C.Code § 1–2004(c) (1987) extends this exemption to public buildings erected by the District government within the "central area" of the District. According to plaintiffs, this explicit exemption in the "central area" operates by implication to make the zoning laws applicable to the District's property in all other areas, including the area where the Hurt Home is located.
>
> Section 1–2004(c) is part of the National Capital Planning Commission statute, which was enacted to secure the comprehensive planning and orderly development of the National Capital, and it is not a part of the District's zoning statutes. The zoning statutes themselves do not explicitly cover the District as a property owner, and accordingly the general rule exempting municipalities from their own zoning laws and regulations controls.
>
> Plaintiffs also rely on a 1959 Order of the Board of Commissioners, the predecessor of the present District Council, which stated that the Commissioners, as a matter of "policy," would require District property to comply with the then recently enacted zoning regulations. Plaintiffs contend that defendants are bound by that position. In response, however, defendants correctly point out that very same Order states that the zoning regulations are not legally applicable to construction of District and federal buildings. The 1959 Order is therefore nothing more than a statement of policy. The legislature, not this court, remains the final arbiter of what that policy shall be with respect to the District's compliance with its own zoning laws and regulations in carrying out a governmental function. Until such a policy is explicitly mandated by statute in this jurisdiction, the municipal government may choose to follow the requirements of the zoning laws applicable to private property owners, but it is also free to disregard those requirements in the exercise of executive branch discretion. Defendants are therefore entitled to summary judgment on this issue.

Memorandum Opinion at 5–7. The judge went on to hold that the District's exemption from compliance with the zoning laws also rendered it exempt from the certificate of occupancy requirement and from the "Old Georgetown" Act.

Although the Georgetown residents' contention based on a negative implication sought to be drawn from D.C.Code §§ 5–432 and 1–2004(c) has some superficial appeal, we think the true intent of Congress regarding District public buildings in the central area was that, *whether or not* § 5–432 covers such buildings as a general matter, it does not do so with respect to such buildings in the central area. Any inference based on the maxim *"expressio unius est exclusio alterius"* in connection with § 1–2004(c) is, in our view, insufficient to rebut the presumption that municipalities are exempt. As one commentator has observed,

> [m]unicipal zoning regulations or restrictions usually do not apply to the state or any of its subdivisions or agencies, unless the legislature has *clearly manifested* a contrary intent.

8 McQuillin, *supra,* § 25.15, at 39 (emphasis added). No such contrary intent has been clearly manifested here.

The Georgetown residents take sharp issue with Judge Weisberg's holding that as of the time of his decision, the zoning laws of this jurisdiction did not apply to the District of Columbia. With at least equal asperity,[13] the District insists that the judge was right. Substantially for the reasons stated by the trial judge, we think that the District was previously exempt. A recent change in the law, however, may have rendered academic an issue over which the parties crossed swords so fiercely and for so long.

### C. The New Legislation.

#### (1) The Comprehensive Plan Amendments Act

■ The Council for the District of Columbia declared in 1989 that as of May 23, 1990, "the government shall be subject to zoning." Comprehensive Plan Amendments Act of 1989 (CPAA), D.C.Law 8–129, 37 D.C.Reg. 55, 235 (1990) (now codified at D.C.Code § 1–250 (1990 Supp.)). According these words their ordinary meaning, see People's Drug Stores, Inc. v. District of Columbia, 470 A.2d 751, 753 (D.C.1983) (en banc), we must hold that although the District government was previously exempt from zoning laws applicable to private parties, it is exempt no longer.

The CPAA does not define the term "zoning." 11 DCMR § 100.5 (1987) provides, however, that

> [t]he regulations set forth in this title shall be known and may be cited by the short form title as the Zoning Regulations of the District of Columbia.

These regulations restrict the size of buildings and their surrounding property, govern population density and land use in general, and divide the District of Columbia into zoning districts. Id. § 100.4. They explicitly cover zoning variances and special exceptions, id. §§ 3107, 3108, as amended by Notice of Final Rulemaking, Case No. 84–10, 36 D.C.Reg. 1509, 1522

(1989), applications or petitions for zoning amendments, id. ch. 30, as amended by Notice of Final Rulemaking, Case No. 86–3, 36 D.C.Reg. 7629, 7629–31 (1989), and the issuance of certificates of occupancy, see id. § 3203, as amended by Notice of Final Rulemaking, Case No. 87–2, 36 D.C.Reg. 7827, 7827–28 (1989), and Notice of Final Rulemaking, Case No. 87–2, 36 D.C.Reg. 653, 654–55 (1989). We conclude that it is these Zoning Regulations to which the District has been subject since May 23, 1990.

The provisions of these regulations, which we have cited at pages 1151–1152, supra, establish beyond peradventure that if the CPAA applies to this case, the District may not use the Hurt Home as it proposes to use it without securing a new certificate of occupancy and without either receiving authority to do so from the Board of Zoning Adjustment or obtaining the rezoning of the area by the Zoning Commission. Indeed, we do not understand the District to maintain the contrary. The remaining question, therefore, is whether the CPAA applies.

#### (2) The applicable case law

The District treats this issue as though it involved the "retroactive" application of the CPAA. This characterization is, at best, an oversimplification. The use of the Hurt Home as a facility for emotionally disturbed youngsters had not occurred as of May 23, 1990. The operation of the CPAA vis-a-vis such proposed utilization of the facility is thus entirely prospective. For the reasons discussed below, see pages 1153–1155 & 1156–1157 n. 19, infra, this does not end the inquiry. Any reasonable assessment of the record surely constrains us, however, from treating the case as one of retroactive legislation.

■ Applicable principles of zoning law provide no clear-cut answer to the question of coverage. That the District acquired the site prior to May 23, 1990 is not dispositive.

---

**13.** The District has denounced various arguments made by the Georgetown residents as "ludicrous" or "preposterous" and, on several occasions, as "absurd." The residents have responded with epithets like "nonsensical" and

"stunning," the latter term evidently not being employed in its complimentary sense. Argument by strident adjective is not helpful to the court even when it is contained in an otherwise excellent submission.

"[T]he mere purchase of land does not create a right to rely on existing zoning." *Vienna Council v. Kohler*, 218 Va. 966, 244 S.E.2d 542, 548 (1978). The Georgetown residents acknowledge that an existing non-conforming use will ordinarily be permitted to continue until it can be eliminated without depriving the user of a vested right, but this protection applies only if the nonconforming use is an existing one. *See* D.C.Code § 5–423 (1988). As the court explained in *Massachusetts Ave. Heights Citizens Ass'n v. Embassy Corp.*, 139 U.S. App.D.C. 355, 357 n. 1, 433 F.2d 513, 515 n. 1 (1970), a nonconforming use consists of the *"continued* use of a structure for a purpose lawful under zoning at the time of the *initiation* of that use but not so under subsequently adopted changes in zoning." (Emphasis added). "A mere intention to use is not enough to establish a nonconforming use." *Harris Used Car Co. v. Anne Arundel County*, 257 Md. 412, 417, 263 A.2d 520, 523 (1970); *see also* 82 AM. JUR.2d *Zoning and Planning* § 186 (1976 & Supp.1990) and authorities there cited.

Familiar equitable principles, however, provide some protection to those who have substantially changed their position in reliance on existing zoning regulations. *See, e.g. Steuart Petroleum Co. v. Board of County Comm'rs*, 276 Md. 435, 347 A.2d 854 (1975). As the court stated in *Steuart Petroleum*, (quoting 2 A. RATHKOPF, THE LAW OF ZONING AND PLANNING, ch. 57–6, 57–7 (3d ed. 1972)),

> [t]he majority rule, which can be synthesized from the multitudinous decisions in this area, may be stated as follows: A landowner will be held to have acquired a vested right to continue the construction of a building or structure and to initiate and continue a use despite a restriction contained in an ordinance where, prior to the effective date of the ordinance, in reliance upon a permit theretofore validly issued,[14] he has, in good faith, made a substantial change of position in relation to the land, made substantial expenditures, or has incurred substantial obligations.

276 Md. at 442, 347 A.2d at 859. *Cf. Rafferty v. District of Columbia Zoning Comm'n*, 583 A.2d 169, 174–76 (D.C.1990) (estoppel and laches); Annotation: *Zoning: Building in Course of Construction as Establishing Valid Nonconforming Use or Vested Right to Complete Construction for Intended Use*, 89 A.L.R.3d 1051, 1058 (1979 & Supp.1990), and authorities there collected.

A different but related problem is presented here by the Georgetown residents' reliance on the enactment, since the trial judge's decision, of a statute which substantially altered the applicable law. Analysis of the jurisprudence pertinent to this sequence of events must begin with the Supreme Court's landmark decision almost two centuries ago in *United States v. The Schooner Peggy*, 1 Cranch (5 U.S.) 103, 2 L.Ed. 49 (1801). As Chief Justice John Marshall wrote for the Court in that case, 1 Cranch (5 U.S.) at 110,

> [i]t is in the general true that the province of an appellate court is only to enquire whether a judgment when rendered was erroneous or not. But if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional, ... I know of no court which can contest its obligation ... In such a case the court must decide according to existing law, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside.

*Accord, Bell v. Maryland*, 378 U.S. 226, 231 & n. 2, 84 S.Ct. 1814, 1817 & n. 2, 12 L.Ed.2d 822 (1964). More recently, the Supreme Court has stated that an appellate court must "apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). Our decisions are to the same effect. *Tenants of 2301 E*

---

**14.** Or, as here, in reliance on prior law not   requiring such a permit.

*Street, N.W. v. District of Columbia Rental Hous. Comm'n,* 580 A.2d 622, 628 (D.C. 1990); *Capitol Hill Restoration Soc'y v. District of Columbia Zoning Comm'n,* 380 A.2d 174, 177 n. 1 (D.C.1977).

In light of these authorities, we conclude that, whether our focus is on the applicable principles of zoning law [15] or on *The Schooner Peggy* and its progeny, the crucial inquiry is largely the same. The CPAA presumptively applies to the proposed use of the Hurt Home unless the District can demonstrate that equitable principles require a contrary result.

### (3) The status of the project as of May 23, 1990

■ After the CPAA became effective on May 23, 1990, we asked the parties to submit a stipulation, if possible, regarding the status of the project as of that date, as well as briefs on the question of the applicability of the new statute to this case. The parties entered into a partial stipulation as indicated in the margin [16] and separately provided additional information by affidavit and exhibits. Specifically, the District filed the affidavit of Michael J. English, Chief Administrative Officer of the District of Columbia Commission on Mental Health Services (CMHS), who has had oversight on behalf of the CMHS of the progress toward the conversion of the Hurt Home to its proposed use. Mr. English's affidavit contains a Hurt Home chronology, significant parts of which are set out in the margin,[17] of developments since the formation in January 1988 of the Hurt

---

15. Although the zoning cases are generally articulated in terms of "vested rights" rather than "manifest injustice," see Annotation, *supra* 89 A.L.R.3d at 1054–55, the analysis is similar. Where a landowner has, in good faith, changed his position, made substantial expenditures, or incurred substantial obligations in reasonable and good faith reliance on prior law—and this is the test in the zoning cases, *see Steuart Petroleum Co., supra,* 276 Md. at 442, 347 A.2d at 859—then it would be plainly unjust to subject him to requirements imposed after he has done so.

16. The stipulation was as follows:
*Work Performed by the District of Columbia Since Title Was Acquired in Late 1987 and Prior to May 23, 1990*
• General repairs to the existing metal roofing, including scraping, patching and coating roofing;
• Repair and replacement of existing metal handrail at the building's entrance on R Street;
• Scraping, priming and repainting existing metal and wood trim on the exterior of the building, including window and door frames;
• Reglazing cracked and broken glass lights in existing windows;
• Cleaning the existing main entrance exterior steps;
• Repairing and painting the existing plaster soffit above the main entrance porch;
• Replacement of broken or burned out electrical lamps in the interior and exterior lighting systems;
• Re-keying miscellaneous existing door lock cylinders;
• Providing a live-in caretaker to monitor the property, clean the interior of the building and greet visitors;
• Moving furniture previously used by the residents of the Hurt Home, e.g. beds, bureaus,

etc., to other facilities of the Commission on Mental Health Services; and
• General upkeep of the exterior grounds of the property on an ongoing basis, which includes trimming hedges and shrubs, lawn mowing, pruning, weeding and mulching.

17. March 9, 1988—CMHS engineers completed drawings of existing conditions.
June 27, 1988—Schematic design for renovation completed.
\*   \*   \*   \*   \*   \*
July 28, 1988—A/E firm selected to provide the required design services and prepare construction documents.
\*   \*   \*   \*   \*   \*
February 28, 1989—A/E contract executed following negotiations. A/E work commenced.
\*   \*   \*   \*   \*   \*
October 5, 1989—The preliminary and final site plans were submitted by the District and approved by the National Capital Planning Commission.
\*   \*   \*   \*   \*   \*
January 5, 1990—Solicitations for bids for renovation/construction work advertised.
. . . .
\*   \*   \*   \*   \*   \*
March 7, 1990—DPW engineers recommended award to contractor.
March 16, 1990—Purchase requisition issued. Awaiting contractor's submissions of legally required affirmative action plan for approval by Office of Human Rights and labor plan for approval by D.C. Apprenticeship Council.
March 23, 1990—Special procedure initiated for review of the contract due to fact it totalled over one million dollars.
March 27, 1990—Contract executed by DPW contracting officer and forwarded to DAS for review and approval.

Home Advisory Board, a group of Georgetown citizens supportive of the project. The question now presented is whether the facts revealed by the stipulation and the affidavits are sufficient to show that manifest injustice would result from the application of the CPAA to the present controversy.

We appreciate the need for dispatch in resolving this case. Indeed, our request for a stipulation and accompanying submissions was made in the hope that a remand might be avoided. Nevertheless, appellate courts are not equipped for fact-finding, and we conclude that it is not possible fairly to assess the existence or non-existence of "manifest injustice," *see Bradley, supra,* 416 U.S. at 711, 94 S.Ct. at 2016, on the basis of the present paper record.

It is readily apparent that the contemplated use of the Hurt Home has long been a part of the District's plans and that significant amounts of money and effort have been expended to the end of bringing these plans to fruition. According to Mr. English, the District had spent 5.7 million dollars on the project at the time of his affidavit, of which 2.9 million were for purchase of the Hurt Home and 2.8 million for architectural, engineering, design and renovation work. The materials before us, how-ever, also reveal that, as of May 23, 1990, a great deal more remained to be done.

It is not merely a matter of occupancy not yet having begun. Mr. English's affidavit discloses that a contract costing in excess of a million dollars was awarded to Len Parker, Inc., the contractor who was ultimately selected to do the construction work, after the effective date of the CPAA. Representatives of the District arguably knew or should have known by that time, if not earlier,[18] that their projected plans for the Hurt Home would be in conflict with the zoning classification of the site. If the trier of fact were to find that the District, armed with such knowledge, attempted without adequate justification to present the court and the community with a *fait accompli,* this would severely undercut the District's claim of manifest injustice.[19]

We think that the trial court is the proper forum for the initial resolution of issues resulting from the enactment of the CPAA. A trial judge is in a far better position than an appellate tribunal to determine whether a party acted in good faith, whether there was reliance in fact on prior law, and, if so, whether such reliance was reasonable. Moreover, in evaluating the District's actions in contemplation of the change in law and thereafter, a record must be made as to what would have occurred if the District

---

May 3, 1990—DAS approved contract, and forwarded to City Administrator's Office and Corporation Counsel for review and approval.

May 25, 1990—Contract package forwarded to Mayor for final review required by procurement regulations.

June 4, 1990—Award letter issued to contractor, Len Parker, Inc.

July 23, 1990—Pre-construction conference held at DPW.

July 30, 1990—Notice to Proceed issued to contractor.

August 1990—Contractor began asbestos testing and demolition work on Hurt Home interior.

**18.** Officials of the District may have been on notice well before May 23, 1990 that the District's claimed exemption from the Zoning Regulations was about to become history. The proposed legislation was debated by the Council in October 1989.

**19.** *See Tucson v. Arizona Mortuary,* 34 Ariz. 495, 272 P. 923 (1928) (where property owner was aware that ordinance was under contemplation which would have prohibited proposed construction of a mortuary, he would not be heard to complain of any loss which arose from his actions after he had knowledge that ordinance was under consideration); *Donadio v. Cunningham,* 58 N.J. 309, 321, 277 A.2d 375, 382 (1971) (municipality should, in the public interest, be afforded an opportunity to amend its zoning ordinance and appeal from an adverse decision; steps taken by landowner while such proceedings are pending should not result in the vesting of rights because he "should not be able to thwart that public interest by a 'bootstrap' operation and winning an unseemly race"); *Graham Corp. v. Board of Zoning Appeals,* 140 Conn. 1, 5–7, 97 A.2d 564, 566–67 (1953) ("hurried incurring of expenditures" on excavation immediately following issuance of building permit did not "commend itself to any equitable consideration" where landowner should have known appeal was likely; the court observed that "[t]he difficulty in which the plaintiff finds itself on this matter of expense was one of its own deliberate choice"); Annotation, *supra,* 89 A.L.R.3d at 1064–68.

had *not* awarded the contract to Len Parker, Inc. after the effective date of the statute. If the District acted reasonably and in good faith in this regard,[20] and if subjecting the District to the Zoning Regulations would bring about a major financial loss to the taxpayers or other serious private or public harm,[21] then this might arguably constitute the kind of manifest injustice contemplated by the case law. If, on the other hand the trial judge were to find that the District acted as it did so as to substitute a *fait accompli* for judicial resolution of the controversy, the thwarting of such a design, although potentially disadvantageous to the prospective residents of the Hurt Home, would not constitute injustice, manifest or otherwise.[22]

We therefore remand the case to the trial court with respect to the zoning issues with directions that it determine, after an evidentiary hearing, whether application of the CPAA to the present case would be manifestly unjust.

## III

### THE CERTIFICATE OF NEED ISSUE

The Georgetown residents also maintain that in seeking to convert the Hurt Home to its proposed use without first applying for and receiving a certificate of need from the District of Columbia State Health Planning and Development Agency (SHPDA), the District violated the Certificate of Need Act. They claim that the trial judge was in error when he apparently concluded that the Mental Health Services Act implicitly repeals the CONA. The District acknowledges that, but for the SHPDA, a certificate of need would be required. It maintains, however, that the Georgetown residents lack standing to contest the District's failure to obtain such a certificate, and that even if they have standing, the trial judge correctly ruled that the MHSA rendered the CONA inapplicable. We agree with the Georgetown residents.

### A. The Background of the Certificate of Need Act.

The Certificate of Need Act was enacted in 1980 in order to enable the District to qualify for federal financial assistance pursuant to Title 15 of the Public Health Service Act (PHSA), 42 U.S.C. §§ 300k–1 to 300n–6 (1982) (repealed 1986). The PHSA was itself enacted as part of the National Health Planning and Resources Development Act of 1974, Pub.L. No. 93–641, 88 Stat. 2225 (1975) (NHPRDA). The purposes of the NHPRDA were to "facilitate the development of recommendations for a national health planning policy, to augment areawide and State planning for health services, manpower, and facilities, and to authorize financial assistance for the development of resources to further that policy." 42 U.S.C. § 300k(b) (1982). The NHPRDA authorized federal financial assistance to the states and to the District of Columbia

---

**20.** *E.g.*, if termination or suspension of negotiations would have meant the irremediable and substantial loss of an arrangement advantageous to the taxpayers.

**21.** According to Mr. English,

[d]elay in performance of [the contract signed on May 27, 1990] might subject the District to liability for extensive delay charges and/or other damages. Moreover, if the delay were significant, there could be a need to repeat the elaborate procurement process for a contract of this type, causing considerable delays and increased expenditures for the District.

The District also spends more than twenty-five million dollars per year to send handicapped children to institutions outside the District, and delays in the projected use of the Hurt Home may defer the alleviation of this problem.

**22.** There is considerable doubt as to whether principles of estoppel can be applied against the District insofar as the exercise of its authority in the issuance of building permits is concerned. *Rafferty, supra,* 583 A.2d at 175 & n. 5, and authorities cited. We are dealing here, however, with the activities of the District in its capacity as a landowner potentially or actually subject to the zoning laws, not as the decision-maker, and the rationale of the authorities cited in *Rafferty* does not apply.

We recognize that it is conceptually odd to apply the notion of manifest injustice to a party which has it within its own power to cure the alleged violation of the zoning laws by simply exempting the Hurt Home. Since the CPAA puts the District into the same position as private parties vis-a-vis the zoning laws, however, we think that the analysis applicable to private parties must apply here.

in order to promote health planning and development. *Id.* §§ 300m–3, 300m–4.

In order to become eligible to receive such federal financial assistance, a jurisdiction was required to establish a "[s]tate health planning and development agency" and an "administrative program," both of which required approval by the Secretary of Health and Human Services. *Id.* §§ 300m, 300m–1, 300m–4. Among the functions of the agency would be to "administer a State certificate of need program which applies to the obligation of capital expenditures within the State and the offering within the State of new institutional health services and the acquisition of major medical equipment and which is consistent with standards established by the Secretary by regulation." *Id.* § 300m–2(a)(4)(B). By requiring states to impose a need requirement before an applicant could offer a new institutional health service, Congress hoped to reduce maldistribution of health care facilities, a phenomenon which had led to the oversupply of medical services in some areas and a dearth of services in others. *North Carolina ex rel. Morrow v. Califano,* 445 F.Supp. 532, 534 (E.D.N.C.1977) (quoting 42 U.S.C. § 300k(a)(3)(B) (1982)), *aff'd mem.,* 435 U.S. 962, 98 S.Ct. 1597, 56 L.Ed.2d 54 (1978); *see also* S. REP. NO. 1285, 93d Cong., 2d Sess. 39, *reprinted in* 4 U.S. CODE CONG. & ADMIN. NEWS 7842, 7878–79 (1974).

In 1986, Congress repealed Title 15, including the federal mandate for state certificate of need programs. *See* Act of November 14, 1986, Pub.L. No. 99–660, § 701, 100 Stat. 3743, 3799. Nevertheless, the District's program, originally enacted in 1980, continues to operate. It requires that

[a]ll persons proposing to offer or develop a new institutional health service or to obligate a capital expenditure in the District shall, prior to proceeding with that offering, development or obligation, obtain from the SHPDA a certificate of need indicating that there exists a public need for such new service or expenditure.

D.C.Code § 32–303(a)(1) (1988). In addition,

[e]xpenditures in excess of $150,000 in preparation to develop or offer a new institutional health service for which a certificate of need is required or arrangements or commitments for financing an offer or development of a new institutional health service for which a certificate of need is required shall not be made by any person unless a certificate of need has been granted.

*Id.* § 32–303(e).

The Certificate of Need Act specifically includes the District government within the definition of the term "person." *Id.* § 32–302(13). It requires the SHPDA, which the Mayor created in 1976, *see* Mayor's Order 76–59, 22 D.C. Reg. 4302 (1976), to review all applications for certificates of need. D.C.Code § 32–304(a) (1988). The statute and the regulations promulgated pursuant to the CONA set forth numerous criteria which an applicant must meet in order to secure a certificate. *See id.* § 32–305 (1988 & 1989 Supp.); 22 DCMR § 4050 (1986).

The CONA further requires the agency to adopt and revise regulations, in accordance with the DCAPA, to govern application review procedures. D.C.Code § 32–304 (1988). Currently, these regulations require the SHPDA to give "[t]imely written notification of the beginning of the review," either by publication or mail, to the general public, to all "affected persons," and to any person who has asked to be placed on the SHPDA mailing list. 22 DCMR §§ 4201.1, 4201.3 (1986). "Affected persons" include the applicant, other health care facilities, certain health care agencies and their insurers, and "members of the public who reside in or regularly use health services in the geographic area to be served by the applicant." *Id.* § 4201.2.

Upon timely written request, the agency must afford any affected person an opportunity for a public hearing on the application. *Id.* § 4302.2. At the hearing "any person shall have the right to be represented by counsel and to present oral or written argument and evidence relevant to the mat-

ter that is the subject of the hearing." *Id.* § 4302.3. In addition, "[a]ny person affected by the matter that is the subject of the hearing may conduct reasonable questioning [of witnesses]." *Id.* § 4302.4.

Upon a request from "any person" for reconsideration of a decision affecting an application, the SHPDA must, if good cause is shown, hold a public hearing. D.C.Code § 32–308 (1988). "Any previously appearing person" has the right to appeal the final decision to the Board of Appeals and Review. *Id.* § 32–309. Finally, "any person adversely affected" by the ruling of the Board may appeal to this court. *Id.* § 32–310.

*B.  Standing.*

■ In the trial court, the District unsuccessfully challenged the Georgetown residents' standing to allege that the District had violated the National Capital Planning Commission statute,[23] but made no attempt to contest their standing with regard to the Certificate of Need Act claims. At the appellate level, the District did not cross-appeal from Judge Weisberg's order with regard to appellants' standing to bring the NCPC Act claim, and raised no issue in its initial brief on appeal with respect to their standing with respect to the CONA claim. At oral argument, however, members of the court inquired, *sua sponte,* whether the Georgetown residents had alleged the kinds of injury which the CONA was designed to redress. Counsel were also questioned as to whether the District had waived any objection to appellants' standing by failing to raise it in the trial court. At the request of the court, the parties submitted supplemental post-argument briefs on these issues. Having considered these submissions, we now hold that, although their substantive claims of injury are of little if any relevance to the purposes of the CONA, the Georgetown residents have statutory standing to bring the underlying action. The District's failure to raise the issue of standing, either in the trial court or in its initial submission before this court, is not conclusive,[24] but the effective concession of the point reinforces the decision which we now reach.

A brief discussion of the jurisdictional basis for this lawsuit will place the issue of standing in perspective. The Georgetown residents brought their action pursuant to D.C.Code § 11–921(a)(6) (1989), which vests the Superior Court with jurisdiction over "any civil action or other matter, at law or in equity, brought in the District of Columbia." This court has held that § 11–921(a)(6) permits a party "aggrieved" by a decision of a District of Columbia agency to initiate an appropriate action in the Superior Court for equitable relief, unless this court has jurisdiction under the DCAPA to consider a direct appeal. *See, e.g., Capitol Hill Restoration Soc'y, Inc. v. Moore,* 410 A.2d 184, 188 (D.C.1979); *Columbia Realty Venture v. District of Columbia Hous. Rent Comm'n,* 350 A.2d

23. Judge Weisberg ruled, in pertinent part, as follows:

Plaintiffs have alleged both economic and non-economic injuries arising out of the decision of the district government to place a residential youth mental health treatment facility at 3050 R Street, N.W. It is possible that, had the defendants submitted their proposal for the Hurt Home to the NCPC, the NCPC would have persuaded defendants not to implement the plan. Thus, plaintiffs have alleged a potential injury that can be fairly traced to the challenged omission and that could be redressed by a favorable ruling.
Memorandum Opinion at 12 (footnote omitted).

24. Lack of standing may be raised at any time. *American Security Bank, N.A. v. American Motorists Ins. Co.,* 538 A.2d 736, 737 n. 1 (D.C. 1988); *Lee v. District of Columbia Bd. of Appeals*

*and Review,* 423 A.2d 210, 215 (D.C.1980). Indeed, an appellate court may, and in some cases perhaps must, raise the issue *sua sponte. Lee, supra,* 423 A.2d at 215. Where, as here, there is no factual record before the court, and standing is challenged on the pleadings, we accept as true all of the material allegations of the complaint and construe them in the light most favorable to the complaining party. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). The Georgetown residents concede that, in light of these authorities, and subject to the principles enunciated in *Warth,* the question of standing is properly before us. We agree, but also note that the failure of the District, a resourceful institutional litigant, to contest standing at all until the court raised the issue *sua sponte,* is persuasive at least to some degree that the belated challenge may lack merit.

120, 124 (D.C.1975). Although we have direct appellate jurisdiction over decisions of the SHPDA (following an appeal to the Board of Appeals and Review), the Superior Court has original jurisdiction to entertain the present suit, in which the Georgetown residents seek to prevent the District from offering a new institutional health service without SHPDA approval. Indeed, the Superior Court's subject matter jurisdiction over this case has not been contested by the District.

The question which has now been raised, however, is whether the plaintiffs who have here alleged a statutory violation have standing to do so. In order to reach the merits, the Georgetown residents must satisfy both the "constitutional" requirement of a "case or controversy" and the "prudential" prerequisites of standing. *See Community Credit Union Servs., Inc. v. Federal Express Servs. Corp.*, 534 A.2d 331, 333 (D.C.1987) (District of Columbia courts "look to" federal standing jurisprudence, constitutional and prudential, even though these courts were not established pursuant to Article III of the Constitution). Generally, the standing requirement is an *additional* element of jurisdiction, *see American Security Bank, N.A. v. American Motorists Ins. Co.*, 538 A.2d 736, 737 n. 1 (D.C.1988); *Lee v. District of Columbia Bd. of Appeals & Review*, 423 A.2d 210, 215 (D.C.1980), which helps to "insure that the legal questions presented to the court will be resolved, not in the rarefied atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

In *Community Credit Union*, we summarized the constitutional requirements of standing as follows:

> a plaintiff must show that it has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, that the injury fairly can be traced to the challenged action, and that it is likely to be redressed by a favorable decision.

534 A.2d at 333 (citation and internal quotation marks omitted). With regard to prudential principles, we explained that "a plaintiff may assert only its own legal rights, may not attempt to litigate generalized grievances, and may assert only interests that fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* (citation and internal quotation marks omitted). We conclude that the individual Georgetown residents, as well as the citizens' organization,[25] meet both of these tests.

The ultimate concerns which the Georgetown residents assert in their opposition to the proposed use of the Hurt Home relate to neighborhood tranquility, property values, public safety and traffic congestion. The District contends, not without reason, that these are not interests which the Certificate of Need Act was designed to protect. The CONA was initially established to enable the District to become eligible for federal financial assistance. It provides a means for the SHPDA to review changes in the District's health care system so as to "promote effective and equitable health planning and regulation of new institutional health services and capital expenditures proposed for the District of Columbia." D.C.Code § 32–301 (1988). The word "need" as used in the Certificate of Need Act has reference to persons who are ill and ought to be healed—in other words, to

---

**25.** An organization has standing to sue when one of its members has standing. *Warth, supra,* 422 U.S. at 511, 95 S.Ct. at 2211. According to the averments of the complaint, which for standing purposes we must accept as true, *id.* at 501, 95 S.Ct. at 2206, the Georgetown Citizens Association is composed of residents of the Georgetown area. Construing this language in the light most favorable to appellants, *id.,* we

conclude that this category includes persons residing near 3050 R Street, which is itself in Georgetown.

The District has advised us in one of its briefs that one of the original plaintiffs, James Speyer, no longer lives in Georgetown. The trial court can reassess Mr. Speyer's standing upon remand in light of any facts which may be placed in the record in that regard.

potential users of the services—and not to the desires of neighborhood residents who might not want such persons there. The various criteria which are applied as part of the SHPDA review process do not include the types of neighborhood harms which the Georgetown residents claim to be seeking to avert. *See generally* 22 DCMR §§ 4050.2 through 4050.32 (1986).[26]

The threatened future disruption of the tranquility of their neighborhood, however, is not the only injury which the Georgetown residents have asserted in their complaint. They also allege, for example, that the Hurt Home cannot be made fit to serve as a residence for emotionally disturbed children and constitutes an inappropriate use of tax revenues.[27] More significantly for present purposes, they claim to have been denied the right to be heard by the agency charged with determining whether the District's plans for the Hurt Home are consistent with the requirements of the CONA. They maintain that if the District were compelled to comply with the "applicable laws," including the CONA, they would be able "to present their case in opposition to the project at a public hearing before an impartial administrative body," and to obtain judicial review in the event of an administrative decision adverse to their interests.

Arguably, as the District suggests, there is no persuasive reason to permit appellants or others similarly situated to appear before the SHPDA in a CONA proceeding, since that agency (unlike bodies such as the Zoning Commission, the Board of Zoning Adjustment, and the National Capital Planning Commission) is not likely to address issues pertinent to the kinds of concerns here being expressed by neighborhood residents. Assuming, *arguendo*, that the District's position on this point is logically sound, however, it cannot be reconciled with the pertinent statute and regulations.

The CONA provides that any person adversely affected by a final decision of the SHPDA may obtain judicial review. D.C. Code § 32–310 (1988). The word "person" includes individuals, partnerships, and corporations (including associations), as well as the District Government. *Id.*, § 32–302(13). Regulations designed to implement the statute pursuant to § 32–316 define "persons adversely affected" by a final decision of the SHPDA as including "any person residing within the geographic area serviced or to be served by the applicant." 22 DCMR § 4313.4(c) (1986). "Affected persons" who are entitled to notice from the agency of a CONA review include not only the applicant and other potential providers of health care, but also "members of the public *who reside in* or regularly use health services in the *geographic area* serviced or to be served by the applicant." 22 DCMR § 4201.2 (1987) (emphasis added); *see also* D.C.Code § 32–309(a) (1988), providing that a final decision of the SHPDA may be appealed by, among others, the applicant or "any other previously appearing persons." That the appellants, residents of Georgetown, fall within these expansive definitions is not subject to serious dispute.

We are therefore compelled to conclude that if the District had sought a certificate of need, the Georgetown residents would have had the right to participate in the proceedings before the agency and to seek judicial review of an adverse decision. That being so, we do not believe that the District may be permitted to circumvent these rights by the expedient of by-passing the CONA procedure altogether. The Georgetown residents suffered "injury in fact" if their procedural rights were denied, regardless of the court's ultimate assessment of the merits of their substantive contentions. *Committee for Full Employment v. Blumenthal*, 196 U.S.App.D.C. 155, 158, 606 F.2d 1062, 1065 (1979); *see also McCartin v. Norton*, 674 F.2d 1317,

---

**26.** One of the criteria to be considered in reviewing an application for a certificate of need, however, is the "[i]nvolvement of the community in the process of project planning and/or development." 22 DCMR § 4050.14 (1986).

**27.** Arguably, however, this is a "generalized" grievance rather than one personal to these appellants. *Community Credit Union, supra,* 534 A.2d at 333.

1320 (9th Cir.1982). Such a denial of procedural rights is fairly alleged in their complaint.

Accordingly, we hold that the Georgetown residents have sufficiently alleged injury in fact, which is indispensable to "constitutional standing," and that they are within the "zone of interests" protected by the CONA. Assuming, *arguendo*, that the "neighborhood tranquility" interests which they assert are not within the ambit of the CONA, the denial of the right to attend and participate in the proceedings constitutes an independent and legally sufficient injury. *Committee for Full Employment, supra*. The court can redress that injury by directing the District to apply for a Certificate of Need and to provide the Georgetown residents with a hearing as required by the CONA.

Once it has been determined that a case or controversy exists and "constitutional standing" is present, the question whether the litigant is a proper party to request adjudication of a particular issue (*i.e.*, "prudential" standing) is one within the authority of the legislative branch to determine. *See, e.g., Sierra Club v. Morton*, 405 U.S. 727, 732 n. 3, 92 S.Ct. 1361, 1365 n. 3, 31 L.Ed.2d 636 (1972); *Roman Catholic Diocese v. New York State Dep't of Health*, 109 A.D.2d 140, 144–46, 490 N.Y.S.2d 636, 639–40 (3d Dept.1985), *rev'd on other grounds*, 66 N.Y.2d 948, 489 N.E.2d 749, 498 N.Y.S.2d 780 (1985). The CONA and the regulations promulgated pursuant to it plainly provide for participation in agency proceedings, and in the judicial review of agency determinations, by persons in the Georgetown residents' position, and have thus resolved the "prudential" standing issue in the Georgetown residents' favor.

The decision in *Roman Catholic Diocese* also supports our holding here. In that case, a New York statute similar to our CONA provided that "persons adversely affected" by a final decision regarding a certificate of need application had the right to seek judicial review. *Id.* 109 A.D.2d at 142, 490 N.Y.S.2d at 638. Relying on regulations which had defined this term for purposes of the federal NHPRDA, the court held that "persons adversely affected" included "any person residing within the geographical area to be served under the application." The court concluded that any such resident opposed to the issuance of the certificate had standing to seek judicial review. *Id.* at 143, 490 N.Y.S.2d at 639.

*Loyd v. Georgia State Health Planning & Dev. Agency*, 168 Ga.App. 850, 310 S.E.2d 738 (1983), upon which the District places its reliance, provides it with no solace. In that case, the court denied standing to area residents to petition for review of a certificate of need award on the basis of a statute which expressly limited standing to "any applicant for a project, or any competing applicant, or any competing health care facility that has given prior notice to the planning agency, or any county or municipal government in whose boundary the proposed project will be located." *Id.* at 853, 310 S.E.2d at 741 (internal quotation marks omitted). If our statute were like Georgia's in this regard, the Georgetown residents would of course lack standing. The difference between the two statutes is, however, critical. *Loyd* is, if anything, helpful to the Georgetown residents, for it demonstrates that the CONA could have been (but was not) written in a manner which would have led to the result for which the District contends.

There may be a measure of irony in our disposition of the issue of standing. It is entirely possible, if not inevitable, that when a hearing is held on the District's application for a certificate of need, the agency may treat the Georgetown residents' contentions as outside the scope of its inquiry. Until the District has secured a certificate of need, however, the Hurt Home cannot be put to its proposed use. Our decision may well defer, pending a protracted administrative process, the availability of services to District youths who need them, notwithstanding the fact that the Georgetown residents are likely to be able to contribute little of material substance regarding the subjects on which the agency's attention will be focused. Justice in a practical, non-legal sense may well be delayed, and we are not blind to the fact

that, for those whose opportunity is deferred until they are no longer eligible, justice delayed is justice denied. Given the statute and the regulations, however, we are compelled to hold that, at least in the absence of any supervening change in the law, the Georgetown residents' claims regarding the CONA issues are not subject to dismissal for lack of standing to sue.

## C. *The Applicability of the Certificate of Need Act.*

Having concluded that the Georgetown residents have standing to contest the District's failure to obtain a certificate of need, we must determine whether the CONA applies as a matter of substantive law to the proposed use of the Hurt Home. Judge Weisberg concluded that it does not. He reasoned, in pertinent part, as follows:

> In searching for legislative intent, it is axiomatic that a specific statute enacted later in time is given effect over an earlier law generally covering the same subject matter. *Brown v. General Services Administration,* 425 U.S. 820, 834–835 [96 S.Ct. 1961, 1968–69, 48 L.Ed.2d 402] (1976); 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 51.05 (4th ed. 1973). One would therefore ordinarily assume that, with respect to procedures for legislative or administrative review of the necessity for a particular mental health treatment facility, Congress intended the Mental Health Services Act to take precedence over the more general CON statute. More importantly, having provided one elaborate review process, it is highly unlikely that the legislature intended that the Plan, or any particular facility designated pursuant to the Plan, would then be subjected to yet another elaborate and possibly duplicative review process, as required by the CON statute.
>
> The Mayor's final System Implementation Plan calls for the establishment of a residential facility for twenty-four children in fiscal year 1988, but makes no mention of the Hurt Home property. Nevertheless, this Plan was reviewed and accepted by both the District Council and by Congress pursuant to the Mental Health Services Act and, accordingly, it

may now be implemented. Plaintiffs' argument reduces to a contention that the Mayor is proposing to implement a program at the Hurt Home that puts previously unidentified flesh on the program described only skeletally in the Plan. While there may be some merit to this contention, plaintiffs' remedy lies with the Council or with Congress, not with this court. Defendants are entitled to judgment as a matter of law.

Memorandum Opinion at 4–5.

We agree with the Georgetown residents that the judge misapplied the canon of construction which he sought to invoke and failed to give adequate consideration to the doctrine that repeals by implication are not favored. Professor Sutherland's treatise, on which the judge relied, does not support a thesis as broad as the one for which it was cited. According to Professor Sutherland,

> [w]here one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, *the two should be harmonized if possible;* but *if there is any conflict,* the latter will prevail, regardless of whether it was passed prior to the general statute, unless it appears that the legislature intended to make the general act controlling.

2A SUTHERLAND, *supra,* § 51.05, at 499 (emphasis added and footnotes omitted). The italicized language is critical; courts choose the specific statute over the general one only if the two cannot be harmonized, and not otherwise.

Our cases are to the same effect. *See, e.g., In re O.M.,* 565 A.2d 573, 581 (D.C. 1989) ("[W]hen a statute of broad general application ... is *inconsistent* with a more specific provision ..., the latter provision must govern or control ..." (emphasis added and internal quotation marks omitted)), *cert. denied,* —— U.S. ——, 110 S.Ct. 1824, 108 L.Ed.2d 953 (1990); *Onabiyi v. District of Columbia Taxicab Comm'n,* 557 A.2d 1317, 1318–19 (D.C.1989) (general statute provided that "all" violations of statutes, regulations, executive orders or rules relating to the operation of motor vehicles shall

be adjudicated by the Bureau of Traffic Adjudication; specific statute provided that the District of Columbia Taxicab Commission shall have jurisdiction over "all" complaints lodged against taxicab operators; the two were thus irreconcilable and the specific one was held to be controlling); *Graham v. Bernstein*, 527 A.2d 736, 737–39 (D.C.1987) (general statute provided that "any information or document required to be served" may be served by mail; specific statute provided that "[e]very" notice to a tenant to quit shall be served on him personally, if he can be found; no harmonization was possible and the requirement of personal service prevailed); *see also District of Columbia v. Linda Pollin Mem. Hous. Corp.*, 313 A.2d 579, 583–84 (D.C. 1973) ("Where ... general provisions, terms, or expressions in one part of a statute are *inconsistent* with more specific or particular provisions in another part, the particular provisions must govern or control ..." (emphasis added)). On the other side of the coin, where a party has attempted to invoke the canon that a specific statute prevails over a general one, but we have found no conflict between the two, we have held that both apply. *See, e.g., Gonzalez v. United States*, 498 A.2d 1172, 1173–77 (D.C.1985) (although inmate's failure to return to halfway house was punishable as misdemeanor under statute specifically proscribing such conduct and applicable only to halfway house offenses, the inmate was properly convicted of violating broader felony prison breach statute not limited to halfway house violations; the court "[could] not say that [the two statutes] are irreconcilable in any meaningful way," *id.* at 1176, and the prosecutor was authorized to proceed under the felony

statute); *Holt v. United States*, 565 A.2d 970, 976 (D.C.1989) (en banc).[28]

██ In the case before us, there is no conflict between the two statutes, and the condition indispensable for the application of the canon on which the District relies is therefore not present. The CONA applies by its terms to all persons, and the District government is a person. *See* D.C.Code § 32–302(13) (1988). The Mental Health Services Act requires the Mayor's final plan to be in "full compliance" with "all applicable District of Columbia statutes." D.C.Code § 32–623(b)(4). On the face of the two enactments, both are applicable to the proposed use of the Hurt Home. Unless we are to conclude that the Mental Health Services Act effected a *pro tanto* repeal of the CONA by implication, the District must be required to comply with both statutes.

"It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored, and whenever possible statutes should be read consistently." *Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523–24, 106 S.Ct. 768, 771–72, 88 L.Ed.2d 877 (1986) (citations and internal quotation marks omitted); *Simon v. Simon*, 58 App.D.C. 158, 159–60, 26 F.2d 530, 531–32 (1928). As the Supreme Court explained in *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 468, 102 S.Ct. 1883, 1890, 72 L.Ed.2d 262 (1982), there are

> two well-settled categories of repeals by implication—(1) where provisions in the two acts are in *irreconcilable conflict,* the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is

28. *Brown v. General Servs. Admin.*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), which the trial judge cited in his opinion, and on which the District relies on appeal, is not to the contrary. Rather, that decision stands for a much narrower proposition, namely, that when Congress creates a specific remedy, it impliedly limits the use of an earlier, more general one. The Court reiterated in *Brown* its prior holdings that "a narrowly tailored employee compensation scheme preempts the more general tort recovery statutes." *Id.* at 835, 96 S.Ct. at 1969. The Court did not hold or even state that a

specific act overrides a general one even if both statutes can exist together. Such a holding or statement would have required the overruling of substantial precedent. See discussion at 1164–1165, *infra.*

The District also relies on *Washington Water Power Co. v. Federal Energy Regulatory Comm'n*, 249 U.S.App.D.C. 255, 775 F.2d 305 (1985). That case, however, is correctly cited in the leading commentary for the proposition that, *if there is a conflict between a specific statute and a general one,* then the former will prevail. Sutherland, *supra,* § 51.05, at 125 (1990 Supp.).

*clearly intended as a substitute*, it will operate similarly as a repeal of the earlier act. But, in either case, the *intention of the legislature to repeal must be clear and manifest.... Radzanower v. Touche Ross & Co.*, [426 U.S. 148] at 154 [96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976)], quoting *Posadas v. National City Bank*, 296 U.S. 497, 503 [56 S.Ct. 349, 352, 80 L.Ed. 351] (1936).

(Emphasis added). One who claims that a later statute has repealed an earlier one by implication must show that the two acts "are irreconcilable, clearly repugnant as to vital matters to which they relate, and so inconsistent that the two cannot have concurrent operation." *Cedarbrook Realty, Inc. v. Nahill*, 484 Pa. 441, 459, 399 A.2d 374, 383 (1979) (italics omitted) (quoting 1A SANDS, SUTHERLAND ON STATUTORY CONSTRUCTION, § 23.10, at 231 (4th ed. 1972)). *See also State v. Foley*, 140 Vt. 643, 645, 443 A.2d 452, 453 (1982).

Statutory interpretation is an imperfect science, and

> generalities about statutory construction help us little. They are not rules of law but merely axioms of experience.

*Gonzalez, supra*, 498 A.2d at 1176 (citations and internal quotation marks omitted). Nevertheless, the canon disfavoring repeal by implication must be taken seriously. As Judge (now Justice) Scalia wrote for the court in *United States v. Hansen*, 249 U.S.App.D.C. 22, 26, 772 F.2d 940, 944 (1985), *cert. denied*, 475 U.S. 1045, 106 S.Ct. 1262, 89 L.Ed.2d 571 (1986),

> [i]t will not do to give this principle of statutory interpretation mere lip service and vacillating practical application. A steady adherence to it is important, primarily to facilitate not the task of judging but the task of legislating. It is one of the fundamental ground rules under which laws are framed. Without it, determining the effect of a bill upon the body of preexisting law would be inordinately difficult, and the legislative process would become distorted by a sort of blind gamesmanship, in which Members of Congress vote for or against a particular measure according to their varying

estimations of whether its implications will be held to suspend the effects of an earlier law that they favor or oppose.

We therefore disagree with the trial judge's conclusion that the Mental Health Services Act eliminated the District's obligation to comply with the CONA. As we have noted in another connection at page 1164, *supra*, we discern no conflict between the two statutes, irreconcilable or otherwise, and we certainly cannot conclude that the intention of the legislature to accomplish a *pro tanto* repeal of the CONA was "clear and manifest." *Kremer, supra*, 456 U.S. at 468, 102 S.Ct. at 1890. To be sure, duplicate review of projects like the one here at issue, one such review being by several separate legislative bodies and committees and the other by an administrative agency, may be burdensome. That, however, is a contention more appropriately addressed to Congress and to the Council of the District of Columbia than to the courts. Both legislative and administrative review having been mandated by separate statutory enactments, we cannot reasonably conclude that they are "so inconsistent that the two cannot have concurrent operation." *Cedarbrook Realty, Inc., supra*, 484 Pa. at 459, 399 A.2d at 383.

As we have previously observed at pages 1157–1159, *supra*, the purpose of the Certificate of Need Act is to ensure an equitable distribution of health care facilities. Under the CONA, a specific new facility is permitted only if it is "needed." D.C.Code § 32–305 (1988); 22 DCMR §§ 4050.6, 4050.7, 4050.15, 4050.34 (1986). The focus is on the particular facility and the participation in the decision-making process of members of the local community is contemplated. While the Mental Health Services Act requires the District to offer community-based mental health facilities and therefore constitutes an implicit determination that such facilities are indeed needed, the focus of that statute is more general and less site-specific. As the trial judge indicated, the program in the present case was described only "skeletally" in the District's submission to the Council and to Congress, and the Hurt Home was not mentioned at all. Review under the MHSA will not cap-

ture the precise character of a proposed facility (number of beds, staff-to-client ratio, etc.), its location within the District, or other matters peculiar to the particular project. These are the kinds of concerns, on the other hand, that the SHPDA is empowered and qualified to consider. For that agency to review, with these and similar issues in mind, the services which the District proposes to provide at the Hurt Home, would not interfere with the implementation of the Mental Health Services Act. Indeed, such review may arguably complement the work of the various legislative bodies and committees, and does not render the two statutory schemes repugnant to one another.

Accordingly, we hold that the Certificate of Need Act applies to the proposed use of the Hurt Home.

## IV

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed in part, reversed in part, and vacated in part, and the case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*[29]

---

**29.** The Georgetown residents did not initially seek a stay of Judge Weisberg's order pending appeal. In September 1990, however, after this court had requested submissions from the parties on the effect on this controversy, if any, of the newly effective CPAA, the residents filed an emergency motion in this court requesting us to issue a stay pending final disposition of the appeal. In light of the difficulty of the questions here presented and our significant reservations about the sufficiency of the Georgetown residents' showing of irreparable injury, we neither granted nor denied the motion. Work was thus in effect permitted to proceed.

Since we have now held that the District must comply with the CONA before converting the Hurt Home into a treatment center for emotionally disturbed children, and since the land use issues also require further action by the trial court, we must necessarily hold that the District may not put the Hurt Home to the proposed use until it has secured a certificate of need and taken any other steps which the trial court may require on remand. The request for a stay is granted to that extent. All other questions regarding interim relief are referred to the trial court.