CAPITOL HILL HOSPITAL,
et al., Appellants,

v.

The DISTRICT OF COLUMBIA STATE
HEALTH PLANNING AND DEVEL-
OPMENT AGENCY, et al., Appellees,

and

Coalition to Save Capitol Hill Hospital,
et al., Intervenors–Appellees.

Nos. 91–43, 91–102.

District of Columbia Court of Appeals.

Argued April 24, 1991.
Decided Nov. 20, 1991.

Daly D.E. Temchine, with whom Ann Leopold, Washington, D.C., was on the brief, for Capitol Hill Hosp. and Medlantic Healthcare Group.

Martin B. White, Asst. Corp. Counsel, with whom John Payton, Acting Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for the District of Columbia.

Carol R. Golubock, Washington, D.C., for the Coalition to Save Capitol Hill Hosp.

Before FERREN, TERRY and WAGNER, Associate Judges.

FERREN, Associate Judge:

Medlantic Healthcare Group and Capitol Hill Hospital (collectively the Hospital) appeal from two trial court orders. The first (Case I) granted a preliminary injunction, sought by the Coalition to Save Capitol Hill Hospital (Coalition), ordering the District of Columbia State Health Planning and Development Agency (SHPDA or the Agency) to require the Hospital to apply for and obtain a Certificate of Need (CON or Certificate) before terminating acute inpatient services.[1] The second order (Case II) denied the Hospital's motion for a preliminary injunction to prevent SHPDA from enforcing the Certificate requirements against the Hospital. In Case II the Hospital sought relief designed to countermand the Case I order. We hold the trial court lacked subject matter jurisdiction in both instances. Accordingly, we vacate the December 18, 1990 (Case I) order granting the Coalition's requested preliminary injunction and affirm the February 4, 1991 (Case II) order denying the Hospital's requested preliminary injunction.[2]

## I.

The Hospital is an acute care facility located in Northeast Washington. It has

---

1. Acute inpatient services include the operating room, the emergency room, acute medical-surgical beds, and intensive care/coronary beds.

2. The parties raise on appeal a host of issues we do not reach because of our disposition on jurisdictional grounds.

The Hospital argues, in Case I, that the trial court abused its discretion in granting a preliminary injunction because the Coalition had failed to exhaust administrative remedies. The Hospital also contends the trial court erred in failing to require joinder of the Hospital as an indispensable party. In Case II, the Hospital contends the trial court erred in not holding an evidentiary hearing on the application for a preliminary injunction, in not making the findings required for a preliminary injunction, in requiring exhaustion of administrative remedies, and in failing to conclude that the Case I injunction resulted in an unconstitutional taking of private property without just compensation.

The District of Columbia contends, in Case I, that even if the trial court had jurisdiction, it lacked authority to order the District to enforce Certificate of Need (CON) requirements because enforcement decisions are strictly delegated to SHPDA. The District also argues that the trial court was not justified in conducting a de novo review and was required instead to defer to SHPDA's decision as long as it was reasonable. In Case II, the District complains that a preliminary injunction would be improper because it would subject the District to an order conflicting with the court's order in Case I.

The Coalition argues, in Case II, that the Hospital was required to exhaust administrative remedies even though the Hospital was challenging the agency's jurisdiction to require CON review in this case. The Coalition also contends that, in any event, there was no final agency action to review.

served the community for over one hundred years and is licensed to provide 234 medical/surgical beds and 16 intensive care/coronary care beds. In 1989, its emergency room served approximately 27,000 patients. In the fiscal year that ended in June 1990, the Hospital lost over $5 million after a loss of $1.5 million in fiscal year 1988 and a loss of almost $1 million in fiscal year 1989. The Hospital estimates that in fiscal 1991 it will lose approximately $13 million. According to the Hospital these losses are attributable, "in significant part, to the Hospital's consistent inability to receive compensation for nearly half, or more, of the value of the medical care services it provides." As a result of these losses, Medlantic Healthcare Group, an owner and operator of the Hospital since 1982, decided to eliminate the acute inpatient services and to convert the Hospital to a facility for long-term care and short-term psychiatric services.

On October 11, 1990, the Hospital sent SHPDA a letter of intent to apply for a Certificate to permit a realignment of services. Attached to this letter was a copy of a notice that appeared in the Washington Post on October 11, 1990.[3] In its letter, the Hospital described its plan as a "realignment of services," to be "implemented in phases," to create non-acute, long-term care and short-term psychiatric services at the Hospital while consolidating all acute inpatient services at the Washington Hospital Center.[4] Also on October 11, the Hospital sent notices to its employees, to their collective bargaining representatives, and to all physicians with whom it had service contracts saying that the notified employees and physicians would to be laid off permanently on or about December 19, 1990.[5]

On October 19, 1990, the Hospital sent SHPDA a second, "replacement" letter of intent in response to "recent discussions" with the Agency's staff. This letter "reflect[ed] a clarification of timing and regulatory procedures" and noted the Hospital's intention to seek two separate Certificates to proceed with the conversion.[6] The letter indicated that the two stages of the application should be viewed as "a single initiative designed to address community need and financial viability" of the Hospital and the Washington Hospital Center. At the end of the letter, the Hospital added: "regardless of the outcome of this Certificate of Need, the acute inpatient services at CHH will cease operation on or about January 17, 1991."

---

3. The notice stated:
   It is the intent of Medlantic Healthcare Group—its subsidiaries the Washington Hospital Center and Capitol Hill Hospital—to initiate a realignment of beds/services. For further information, please contact [SHPDA].

4. The realignment was to include:
   – The conversion of 130 of [Capitol Hill Hospital's] licensed acute medical-surgical beds to [ ] long-term care beds.
   – The conversion of 57 acute medical-surgical beds to psychiatric beds and the relocation [of Washington Hospital Center's] psychiatric program to the [Capitol Hill Hospital] campus.
   – The relocation of [Capitol Hill Hospital's] remaining acute care beds [ ] and operating room capacity from [Capitol Hill Hospital] to [Washington Hospital Center] to accommodate the acute care patient load from [Capitol Hill Hospital].
   – The conversion of the existing 57 psychiatric beds at [Washington Hospital Center] to 57 medical/surgical beds.

5. The Hospital's plan to close the unit was known to its employees before October 11, 1990.

Richard Ehrmann, Vice President of the union that represents the Hospital's service and technical employees, stated in an affidavit that "[e]ven before [the October 11th] notice was sent to our union, the administration at [the Hospital] told workers to look for other jobs as the hospital was going to be converted to other uses."

6. The letter explained that the first Certificate of Need would authorize conversion of "130 of the existing acute medical-surgical beds at [Capitol Hill Hospital] to 60 skilled and 70 intermediate care beds" costing $500,000. The second Certificate would cover "consolidation of the remaining acute services including operating room capacity on the campus of the Washington Hospital Center." The Hospital applied for the Certificates on November 2, 1990. On February 20, 1991, the agency issued the Hospital the Certificates to convert 130 medical-surgical beds to 70 intermediate beds and 60 skilled care nursing home beds and to continue to enhance the provision of ambulatory care at the Hospital. These Certificates are not the subject of this dispute.

After further discussions with SHPDA officials, the Hospital sent the Agency a third letter on October 26, 1990:

> In [the October 19, 1990] letter we also notified the SHPDA that the acute inpatient services at CHH would be closed on or about January 17, 1991. As that Letter states, it is our intention to terminate those services and obtain a Certificate of Need to convert the hospital building to other uses, but the acute care services will be terminated even if the requested Certificate of Need to do so is not granted. No capital expenditures are required for the closing, but only for the conversion of the building into other uses, for which a Certificate of Need will be requested.

D.C.Code § 32–303(f) (1988) requires a Certificate of Need to close a health service if—and only if—the closing "involves a capital expenditure in any amount." Because of the magnitude of the proposed closing, therefore, SHPDA asked the Hospital to supply an affidavit verifying that no capital expenditure would be needed to close the acute inpatient services. The Hospital sent the affidavit. SHPDA also called the Hospital to determine whether the closing would affect the Hospital's federal (Hill–Burton) loan obligations. While the trial court did not permit Director Graham to disclose her conversation with the officials because of hearsay objections, Graham did testify that she was "satisfied" the closing did not involve capital expenditures. Convinced that the proposed closing would be altogether separate from the conversion project, SHPDA declared in either late October or early November that the closing itself would not require a Certificate.[7]

After learning of the Hospital's intentions, the Coalition [8] hand-delivered letters on October 16, 1990 to the Mayor and to Carolyn Graham, SHPDA Director, detailing alleged violations of the Hospital's outstanding Certificate (of April 20, 1990) and requesting that they revoke the Hospital's April 1990 Certificate. Having received no response, the Coalition petitioned SHPDA on October 23, asking for enforcement action against the Hospital because of continuing Certificate violations.[9] Again, the Coalition received no response. On November 5, the Coalition filed a complaint in Superior Court for equitable relief against the Mayor, SHPDA, and Graham (Case I) without joining the Hospital as a party. In the meantime, three days earlier, the Hospital had filed its formal application with SHPDA for two Certificates of Need for its anticipated conversion.

Judge Moore denied the Coalition's motion for a temporary restraining order. Judge Kessler held a preliminary injunction hearing on December 12 and 13, and, on December 18, she issued a preliminary injunction ordering SHPDA to require the Hospital to obtain a Certificate of Need before closing acute inpatient services.

> [T]he closing of medical surgical services at [the Hospital] is a substantial change in service involving a capital expenditure[.] [SHPDA is] enjoined pending the final disposition of this matter on the merits under D.C.Code 32–303 to require that the Medlantic Health Care Group apply for and obtain a certificate of need

---

7. SHPDA Director Graham stated in an affidavit of December 5, 1990, attached to the Hospital's pleadings in Case II: "No CON review is being conducted of the closure of the acute care service at [the Hospital]. No CON review is required because no capital expenditure is being incurred by the closure action." At the Case I preliminary injunction hearing, Graham testified that "it was our determination that this closing did not require a certificate of need after we had taken the steps I had previously described." She further testified: "The closure was a different event that, in our best effort, we were able to determine did not—that did not involve a capital expenditure and, you know, the other factors related to that."

8. The Coalition is an unincorporated association of residents in the Hospital's service area. It is composed of present and former patients, community groups, physicians who treat patients at the Hospital, and unions representing the Hospital's employees.

9. The Petition is not in the appellate record. Ehrmann testified, in his affidavit, that the petition requested the agency and the Mayor to "take action to enforce the Certificate of Need Law in light of the violations of that law by Medlantic at CHH."

before terminating such services at [the Hospital].

Contrary to SHPDA's earlier ruling, the judge concluded that the closing, like the conversion, was part of the Hospital's announced "single initiative" to reorganize the Hospital and the Washington Hospital Center at a cost of $10 million dollars. Judge Kessler added that, even if the closing as such were seen as an altogether separate transaction, that closing would cause the Hospital itself to shut down and thus trigger required repayment of federal (Hill–Burton) loans. According to Judge Kessler, such repayment would require capital expenditures and thereby invoke the Certificate of Need requirement. The judge accordingly concluded that, under either analysis, the Hospital could not close its acute inpatient services without a Certificate.

That same day, December 18, SHPDA told the Hospital that, because of the court's ruling, the Hospital had to obtain a Certificate before closing its acute inpatient services. On December 20, the Mayor announced that the District would not appeal the preliminary injunction.

The next day, the Hospital filed a complaint for Declaratory Judgment and Injunctive Relief (Case II) in Superior Court against SHPDA and its Director, Carolyn Graham, asking the court to prevent the District from applying Certificate of Need requirements to the Hospital's proposed closing of its acute inpatient services, and seeking a ruling that enforcement of. the Certificate process would amount to an unconstitutional taking. In a nutshell, the Hospital was attempting through a separate lawsuit to undo the preliminary injunction in Case I, to which the Hospital was not a party. On January 4, 1991, the trial court granted the Hospital's request to consolidate Cases I and II and, four days later, granted the Hospital leave to intervene in Case I. That same day, January 8, the Hospital issued a memorandum to its employees saying it had extended their layoffs until a "date between the period of February 20, 1991 and March 5, 1991." On January 8, in response to SHPDA's ruling at-

tributable to the Case I preliminary injunction, the Hospital sent the Agency a Letter of Intent to file Certificate to close its acute inpatient services. Six days later, the Hospital filed a Notice of Appeal in Case I.

On January 30, 1991, Judge Kessler held a non-evidentiary hearing on the issues the Hospital raised in Case II. On February 4, the judge denied the Hospital's motion for preliminary injunction to halt application of the Certificate process to the proposed closing. The judge noted that SHPDA was currently reviewing the Hospital's application for a Certificate to close acute care services and that no final decision had been made. Judge Kessler therefore refused to interfere with SHPDA's decision-making process and dismissed the Hospital's motion because of the failure to exhaust administrative remedies.

The Hospital accordingly sent SHPDA a letter on February 13, requesting expedited treatment of its application for a Certificate and waiver of certain procedural requirements. The District filed a Motion for Temporary Restraining Order on February 14 to prevent the Hospital from closing its acute inpatient services before it had received the required Certificate. The trial court denied the District's motion the next day, ruling it was premature.

On February 19, the Hospital filed an application for a Certificate to close its acute inpatient services. On February 22, Director Graham told the Hospital that SHPDA could not exempt it from a Certificate of Need for closing acute inpatient services and that a final decision on the Hospital's application could not be made until June 20, 1991. Nonetheless, on February 25, the Hospital's President and Chief Executive Officer sent a letter to all employees saying that by March 5 "all acute services will cease." On March 1, the Hospital published a public notice in the Washington Post stating that its emergency rooms had been closed and all new patient admissions halted. On March 5, 1991, the Hospital closed its medical-surgical unit.

## II.

■ We have recently discussed the background and purposes of the District of Columbia Certificate of Need Act of 1980, as amended, D.C.Code §§ 32–301 to –317 (1988 & 1991 Supp.), including the role of SHPDA. *See Speyer v. Barry*, 588 A.2d 1147 (D.C.1991); *District of Columbia Hosp. Ass'n v. Barry*, 586 A.2d 686 (D.C. 1991). Generally speaking—and subject to exceptions not relevant here—a Certificate of Need is required if a health care facility wishes "to offer or develop a new institutional health service or to obligate a capital expenditure" substantially affecting the capacity of existing health services within the District. D.C.Code § 32–303(a)(1) (1988); *see id.* § 32–302(3), (7), (9), (12) (1988).

If a health care facility wishes to close a health service, it must comply with D.C.Code § 32–303(f) (1988), which provides in part:

> The termination or closure of a health service shall be deemed a substantial change in service by the SHPDA, and such termination or closure shall require a certificate of need if it involves a capital expenditure in any amount.

*See also* 22 DCMR §§ 4110.1, 4113.1 to –.9 (1986).[10] To close a health service without a Certificate of Need, the health care facility, no later than 90 days before the proposed closing, must notify SHPDA with a letter containing information specified by regulation to assure that a Certificate is not required. *See* D.C.Code § 32–303(f) (1988); 22 DCMR § 4113.6 (1986).[11] Although the statute does imply that SHPDA is to review every proposed closing, neither the statute nor the regulations expressly provide for SHPDA formally to decide whether capital expenditures will be required for the closing and whether the health care facility may proceed without a Certificate when it believes no capital expenditure is involved.

The statute provides elaborate review procedures for Certificate of Need applications.[12] *See Speyer*, 588 A.2d at 1159–61. The present dispute concerns the applicability of these procedures—if any—to a health care facility's representation, *see* 22 DCMR § 4113.8 (1986), *supra* note 11, that a proposed closing does not involve capital expenditures and thus does not require a Certificate. In order to answer that question, it is important to understand the procedures involved.

Regulations require that once an application for a Certificate is filed, SHPDA must give timely written notice "of the beginning of the review" by mail to "all affected persons" (and to others who have asked to be on SHPDA'S "notification mailing list"). 22 DCMR § 4201.1 (1986). In addition, the general public shall be notified by publication. *See id.* § 4201.3. Either on its own initiative or upon timely written request by

---

**10.** Capital expenditure, under the Certificate of Need Act, is defined in part as:

(A) Any expenditure by or on behalf of a health-care facility ... which is, under generally accepted accounting principles, not properly chargeable as an expense of operation or maintenance and which:

(i) Substantially changes the bed capacity of the facility with respect to which the expenditure is made;

(ii) Is intended to permit or will result in the increase of patient load or units of service of a facility or service by 40% or more over present capacity; ·

(iii) Is made to obtain by purchase, lease or comparable arrangement or through a donation or through any other type of transfer, any major medical equipment ...; or

(iv) Exceeds $600,000[.]

D.C.Code § 32–302(3) (1988). SHPDA has promulgated regulations to implement the statutory requirements for closing a health service when capital expenditures are involved. *See* 22 DCMR §§ 4110.1, 4113.1 to –.9 (1986).

**11.** The notification letter must contain the following information:

(a) A description of what is to be closed;

(b) The name of the person who owns the facility or service to be closed;

(c) The expected date of closure;

(d) The number, type, and condition of patients affected;

(e) Provisions that the provider is making for the continuing care of the affected patients;

(f) A statement that no capital expenditure is involved in the closure; and

(g) The reason for the closure.

22 DCMR § 4113.8 (1986). ·

**12.** Certificate of Need applications must be submitted on a SHPDA-prescribed form telling the applicant which questions are relevant to its proposal. *See* 22 DCMR § 4200.1 to –.3 (1986).

an affected person, SHPDA will hold a trial-type public hearing on the application. *See id.* § 4302.1 to –.4. The regulations provide for completion of the Certificate process within 90 days, subject to extension for specified reasons such as public hearings or additional staff analysis. *See id.* § 4202.2, –.10. The regulations also require that SHPDA review in batches all applications relating to a particular type of hospital service on a semi-annual cycle. *See id.* § 4300.3. Under specified circumstances, review may occur outside batch cycles and even on an expedited basis. *See id.* §§ 4008, 4202.1, 4202.2, 4301.

While administrative review is pending, it is conceivable that a party will take action—for example, eliminating some aspect of a health care service—that threatens to undermine, if not moot, the proceeding. Affected persons who wish to challenge that action and thus preserve the status quo pending administrative review are entitled to seek emergency relief in this court, since we have direct reviewing authority over "contested cases" under the District of Columbia Administrative Procedure Act. D.C.Code §§ 1–1502(8), –1510 (1987).[13] Our authority in such a case is derived from the All Writs Act, 28 U.S.C. § 1651 (1988). *See Federal Trade Comm'n v. Dean Foods Co.,* 384 U.S. 597, 603–05, 86 S.Ct. 1738, 1742–43, 16 L.Ed.2d 802 (1966); L. MODJESKA, ADMINISTRATIVE LAW: PRACTICE AND PROCEDURE § 6.8 (1982). Upon a proper showing, this court will issue appropriate orders to preserve the situation until administrative review has been completed.

Once SHPDA has made a decision on the Certificate application, a party may ask for reconsideration and, indeed, must do so to preserve the right of appellate review. If the requesting party shows good cause, SHPDA must conduct a public hearing on reconsideration. *See* D.C.Code § 32–308 (1988). "After reconsideration by the SHPDA, ... the applicant or any previously appearing persons" may appeal the final decision to the Board of Appeals and Review. *Id.* § 32–309(a).[14] "Any person adversely affected" by the Board's decision may obtain judicial review in this court. *Id.* § 32–310; *see generally Speyer,* 588 A.2d at 1159–61.

### III.

██ The Hospital and the District argue that the trial court lacked subject matter jurisdiction to issue the Case I preliminary injunction compelling SHPDA to require the Hospital to obtain a Certificate of Need before closing the acute inpatient services. *See Mansfield, Coldwater & Lake Michigan R.R. Co. v. Swan,* 111 U.S. 379, 381, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884) (subject matter jurisdiction required to adjudicate claim). A court has such jurisdiction "if the case is one of the type of cases that the court has been empowered to entertain by the sovereign from which the court derives its authority." R. CASAD, JURISDICTION IN CIVIL ACTIONS, ¶ 1.01(1) at 1–2 (1983); *see In re A.H.,* 590 A.2d 123, 129 (D.C.1991) (source of jurisdiction is constitution or statute); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 105, comment *a* (1971) ("A court

---

**13.** D.C.Code § 1–1510 provides in part:

> (a) Any person suffering a legal wrong, or adversely affected or aggrieved, by an order or decision of the Mayor or an agency in a contested case, is entitled to judicial review thereof in accordance with this subchapter upon filing in the District of Columbia Court of Appeals a written petition for review.... Such rules shall include, but not be limited to, the power of the Court:
>
> . . . . .
>
> (2) To compel agency action unlawfully withheld or unreasonably delayed; ...

This is a "contested case," defined as a case in which a specific statute or the Constitution entitles a person to a trial-type hearing to resolve the legal rights of the parties. *See* D.C.Code § 1–1502(8) (1987); *District of Columbia v. Douglass,* 452 A.2d 329, 331 (D.C.1982); *Capitol Hill Restoration Soc'y, Inc. v. Moore,* 410 A.2d 184, 186–87 (D.C.1979). The parties are entitled to a trial-type hearing to determine whether a Certificate of Need is required when a health care facility proposes to close a health care service. *See* D.C.Code § 32–308 (1988); 22 DCMR 4302.1 to –.8 (1986).

**14.** D.C.Code § 32–309 (1988) provides for review of a SHPDA final decision by the Board of Appeals and Review "[a]fter reconsideration by the SHPDA." We interpret this language to mean that a party who wishes to challenge SHPDA's initial ruling on a Certificate application may not bypass the reconsideration process.

**800**

may lack competence either because it has not been given power by the state to entertain the particular action or because there has not been compliance with such requirements as are necessary for the exercise of power by the court"). If a trial court decides a case without jurisdiction to do so, appellate court review is limited to correcting the jurisdictional error. *See United States v. Corrick,* 298 U.S. 435, 440, 56 S.Ct. 829, 831, 80 L.Ed. 1263 (1936); *Council of School Officers v. Vaughn,* 553 A.2d 1222, 1228 (D.C.1989).[15]

In this case, SHPDA carefully reviewed whether the Hospital was required to obtain a Certificate of Need in order to close acute inpatient services lawfully. SHPDA and the Hospital had several discussions about the proposed closing; the Hospital made its intentions clear in letters of October 19 and 26, 1990; SHPDA requested an affidavit verifying that no capital expenditures would be required; and SHPDA investigated whether closing acute inpatient services would trigger repayment of the Hospital's federal (Hill–Burton) loan obligations. SHPDA's Director accordingly testified at the Case I preliminary injunction hearing that "it was our determination that this closing did not require a certificate of need after we had taken the steps I had previously described." See *supra* note 7. In making that determination, SHPDA had to apply—and the Hospital had to comply with—regulations SHPDA had promulgated specifying the notification format and the time frame for closing a health care service when *no capital expenditure is involved. See* 22 DCMR §§ 4113.1, –.6, –.8 (1986), *supra* note 11.

Judge Kessler found that SHPDA had decided no Certificate was required for the Hospital to close its acute inpatient services: "the agency concluded as a matter of law that no capital expenditures were involved and, therefore, that the certificate of need provision of Section 303(f) was not triggered." Furthermore, said the judge,

SHPDA "did not refuse to investigate or refuse to enforce.... [T]he agency did investigate[,] ... [and] adjudicated the claim of [the Hospital,] and decided that no certificate of need was required under the statute." Even if this finding should be deemed a nullity because the trial court lacked jurisdiction, the fact that the agency made this decision is clearly reflected in the evidence. See *supra* note 7. Thus, on this record, the agency made a decision not to require a Certificate before allowing the Hospital to close its acute inpatient services.

The Coalition was fully aware of the Hospital's October 1990 letters to SHPDA disclaiming a need for a Certificate and of SHPDA's decision at the end of October or in early November that no Certificate was required. Indeed, the Coalition mailed a letter to the Mayor as early as October 16, 1990 requesting review of the Hospital's closing activities, and, after receiving no response, the Coalition petitioned SHPDA's Director on October 23, requesting that the agency take action to enforce the Certificate of Need law. When the Coalition received no official response, it filed Case I in the trial court on November 5.

As elaborated above in Part II., the Certificate of Need Act provides for an elaborate administrative and judicial review of Certificate of Need decisions. The Coalition argues, however, that this statutory review process does not apply to closings which SHPDA agrees do not involve a capital expenditure and thus do not require a Certificate of Need. More specifically, the Coalition argues, by reference to statutory language, that it had no recourse before SHPDA because there had been no "decision on an application for a new or renewal certificate of need." D.C.Code § 32–308(a) (1988). Similarly, says the Coalition, an appeal to the Board of Appeals and Review applies only after SHPDA reconsideration

---

15. *See also* CASAD, ¶ 1.01(1) at 1–4: "According to traditional doctrine, if a court should entertain a case that is not within the constitutional or statutory provisions defining its subject matter jurisdiction, its acts would be wholly ineffectual and any resulting judgment would be void. It would be, so the saying goes, as though the case were tried before 'one not a court' (coram non judice)."

of a "final decision ... on an application for a certificate of need." *Id.* § 32–309.

We agree with the Coalition that the statute and regulations refer exclusively to SHPDA review, approval, and reconsideration, as well as to administrative and judicial review, of "applications" for Certificates of Need, *see* D.C.Code §§ 32–303 through –310, and to SHPDA approval of applications by Health Maintenance Organizations (HMOs) for exemption from Certificate of Need requirements, *see id.* §. 32–303(b)(2); there are no prescribed review and appeal procedures for notices, as in this case, that Certificates are not required. But it is clear from SHPDA's own actions in this case, based on the statutory requirement that a hospital give SHPDA 90 days notice of a proposed closing of a health care facility that does not involve a capital expenditure, *see id.* § 32–303(f); 22 DCMR § 4113.6, –.8; *supra* note 11, that such claimed exception to Certificate requirements necessitates administrative review and acquiescence.

For a variety of reasons, SHPDA may decide to use less formal procedures to review a notice of closing without capital expenditures. But the very requirement of a substantial period of notice, the required statement of reasons for the closing, and the provisions to protect affected patients, taken together, *see supra* note 11, imply that SHPDA is empowered to review the proposal and if necessary, with the help of the Corporation Counsel, to try to stop the closing pursuant to D.C.Code § 32–312 (violations) [16] if SHPDA perceives a violation

of law. Neither the Hospital nor the District contends that SHPDA lacks authority to review a notice of closing. Indeed, if SHPDA had no such power, the injunctive and criminal enforcement provisions of § 32–312, see *supra* note 16, would be a nullity in cases, such as this, in which a hospital unilaterally decides no capital expenditure is involved. So construed, this statute would have a hole through which one could drive the proverbial Mack truck. We do not believe the Council could have intended such an absurd result. *See Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 333, 59 S.Ct. 191, 200, 83 L.Ed. 195 (1938) ("[T]o construe statutes so as to avoid results glaringly absurd, has long been a judicial function. Where, as here, the language is susceptible of a construction which preserves the usefulness of the section, the judicial duty rests upon this Court to give expression to the intendment of the law") (footnote omitted); *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754 (D.C.1983) (en banc) (literal meaning of statute will not be followed when it produces absurd results; statutes are to be construed in manner which assumes legislature acted logically and rationally).

Thus, the question is not whether SHPDA and the District have review and enforcement powers over notices of proposed closings of health care facilities that allegedly involve no capital expenditures. The question, rather, is twofold: (1) what is the scope of SHPDA's review power and (2)

---

**16.** D.C.Code § 32–312 (1988) provides:

    (a) It shall be unlawful for any person to proceed with any project which under this chapter would require a certificate of need without first acquiring a certificate of need.

    (b) The Corporation Counsel may seek injunctive relief from a court of competent jurisdiction when he or she finds that a person is offering, developing or operating a service in violation of this chapter.

    (c) Any person violating this chapter by willful failure to obtain a certificate of need, willfully deviating from the provisions of a certificate of need, or beginning or continuing construction or initiating a new or expanded service after expiration of a certificate of need shall be subject to a criminal penalty of not less than $100 and not more than $2,500.

Each day of continuing violation shall constitute a separate offense.

    (d) Any person willfully not providing or withholding information required relative to proposals subject to review under this chapter or any person willfully providing false or intentionally misleading information relative to such proposals shall be subject to a criminal penalty of not less than $100 and not more than $2,500. Each day of continuing violation shall constitute a separate offense.

    (e) The SHPDA may, after holding a public hearing to ascertain the facts, withdraw a certificate of need held by any person which the SHPDA finds has violated the provisions of subsection (c) or (d) of this section regardless of the initiation of any criminal prosecution.

where are the administrative and judicial review and enforcement powers lodged.

■ For purposes of this case no one has dwelt on the scope of SHPDA's review power, including procedures. The focus, rather, has been on the second issue: whether affected persons must seek appellate review initially in an administrative or in a judicial forum. All parties appear to agree that if an administrative remedy is available, review of all proposed closings (including those disapproved by SHPDA) will take place through reconsideration by SHPDA, D.C.Code § 32–308, then through the Board of Appeals and Review, *id.* § 32–309, and, finally, through direct review by this court, *id.* § 32–310. If an administrative remedy is not available, then presumably review of SHPDA's action—or inaction—will be available initially in Superior Court. *See Jones & Artis Constr. Co. v. District of Columbia Contract Appeals Bd.*, 549 A.2d 315, 318 (D.C.1988) (Superior Court jurisdiction for "protest" rather than "appeal" of Board's decision); *Capitol Hill Restoration Soc'y, Inc. v. Moore*, 410 A.2d 184, 188 (D.C.1979) (parties aggrieved by agency's decision in uncontested case may bring equitable action in Superior Court).

The legislative history does not provide an answer to the statutory omission at issue here. *See* COUNCIL OF THE DISTRICT OF COLUMBIA, REPORT ON BILL 3–289 (May 29, 1980) (COUNCIL REPORT).[17] Thus, our responsibility is to " 'effectuate the legislative purpose' ... by an examination of the statute as a whole." *Peoples Drug Stores*, 470 A.2d at 754; *see Crandon v. United States*, 494 U.S. 152, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy"); *Kokoszka v. Bel-*

*ford*, 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974) ("When 'interpreting a statute, the court ... will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature....' ") (quoting *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 194, 15 L.Ed. 595 (1857)); *District of Columbia v. Thompson*, 593 A.2d 621, 632 (D.C.1991) (considering structure of statutory scheme, its objectives, its legislative history, and nature of administrative action involved).

The overriding purpose of the Certificate of Need Act is to "promote effective and equitable health planning and regulation of new institutional health services and *capital expenditures* proposed for the District of Columbia." D.C.Code § 32–301 (1988) (emphasis added). Section 32–303—the section central to this discussion—was designed to monitor the expenditure of capital for health-services in the District. Thus, § 32–303(a)(1) provides that "[a]ll persons proposing to offer or develop a new institutional health service *or to obligate a capital expenditure* in the District shall, prior to proceeding with that offering, development or obligation, obtain form the SHPDA a certificate of need...." (Emphasis added). Furthermore, § 32–303(f) requires that "termination or closure of a health service ... shall require a certificate of need if it involves a capital expenditure in any amount." The relevant legislative history mirrors this purpose:

Bill # 3–289 is intended to bring the District of Columbia into compliance with the Federal Health Planning and Resources Development Act Amendments of 1979 (P.L. 96–79). One requirement of the federal law is that *each state have an acceptable program governing cer-*

---

17. According to the Report:
　Paragraph [32–303] (f) mandates a CON for the termination or closure of a health service if the closure involves a capital expenditure in any amount. This provision conforms with the text of the proposed federal regulations. [Citations omitted.]
　In addition, the proposed bill requires any person proposing to permanently close an

HCF, HMO or health service to notify the SHPDA no later than ninety (90) days prior to closing. This notice provision, a SHPDA suggestion, is intended to facilitate smooth transitional planning in the face of the closing of a facility or service upon which the community or a segment of the community relies for services.
COUNCIL REPORT at 11.

*tain expenditures for health services. Failure to have an approved program subjects a state to a penalty in the form of a reduction in federal public health service grants....* If we do not have appropriate legislation in effect by [October 4, 1980] we jeopardize about twenty-eight million dollars of federal funds that will otherwise flow into the city.

COUNCIL REPORT at 1–2 (emphasis added). Any interpretation of the statute, therefore, must take into account SHPDA's role in planning health services and monitoring capital expenditures.

Given the design of the statute that provides for comprehensive administrative (then judicial) review of Certificate of Need applications, we cannot construe the omission of explicit review provisions for notices of closings without capital expenditures to mean that some *other* review process is permitted or required. That would hardly be logical or rational. *See Peoples Drug Stores,* 470 A.2d at 754. That is to say, we cannot agree that, absent an application for a Certificate (in contrast with a notice to SHPDA under 22 DCMR § 4113.-6, –.8 that a Certificate is not required), there was no "decision on an application," D.C.Code § 32–308(a)—no "certificate of need decision," *id.*—that could be appealed administratively.

Because SHPDA is empowered to review notices of no application, as well as applications, we believe the logic and purpose of the statute dictate that, in either instance, SHPDA will make a decision about a Certificate of Need that falls within the scope, respectively, of §§ 32–308 and –309 on reconsideration and administrative review. Any other interpretation would be inconsistent with the statutory purpose. Allowing a health care facility to close, with no agency review or ruling, would allow health care facilities effectively to exempt themselves from the oversight the statute envisions. For example, if the Hospital's closing would have required repayment of Hill–Burton obligations—an expenditure of capital—there must be some mechanism through which SHPDA could have challenged the closing. Absent such administrative review, a health care facility could

make capital expenditures contrary to the express purpose and logic of the Certificate of Need requirements. The Council could not have meant for such a gap to occur in this otherwise meticulously crafted legislative scheme. *See Armstrong Co.,* 305 U.S. at 333, 59 S.Ct. at 200.

Our interpretation is buttressed by D.C.Code § 32–310 (1988) on judicial review, which provides:

> The final decision upon an application for a certificate of need *or for exemption from certificate of need review under this chapter, after exhaustion of all administrative remedies,* shall be subject to judicial review of a contested case by the District of Columbia Court of Appeals....

(Emphasis added.) This ultimate review provision requires that this court—not the trial court—review SHPDA decisions on "exemptions" from Certificate of Need requirements after exhaustion of administrative remedies (presumably SHPDA reconsideration and a Board of Appeals and Review ruling). Literally, the only "exemption" referred to in the statute is the one for certain HMOs in D.C.Code § 32–303(b)(2). If, however, there is to be a system of administrative and judicial review of all decisions on "applications" for Certificate of Need and on "exemptions," then logic, as well as the scheme of the statute itself, dictates that the exception for closings that do not involve capital expenditures is also covered by the same system of review.

Accordingly, although the reconsideration, administrative review, and judicial review provisions of the statute, D.C.Code §§ 32–308, –309, and –310, respectively, could be clearer, we conclude the Council of the District of Columbia could not have intended to exclude from the purview of these provisions all SHPDA decisions that a Certificate is *not* required. A contrary interpretation would have the effect of vesting the trial court with initial appellate review of a subset of administrative decisions that can be as central to the Certificate of Need process as those rendered when everyone agrees a Certificate is re-

quired. It does not make sense to create one review process—agency reconsideration, Board of Appeals and Review review, Court of Appeals review—when SHPDA decides a Certificate is required, and another review process—initially the Superior Court, then this court—when SHPDA decides a Certificate is not required. We do not believe the Council enacted such two-track review. Whether a closing involves a "capital expenditure," D.C.Code § 32–302(3) (1988); 22 DCMR 4113.1 (1986); *District of Columbia Hosp. Ass'n*, 586 A.2d at 688–89, including the question whether any expenditure "substantially changes" bed capacity, D.C.Code § 32–302(3)(A)(i), see *supra* note 10, depends on complicated analysis that is just as much within the expertise of the Agency as the analysis required for a Certificate of Need itself. We believe the Council must have intended the same review process for all Certificate of Need issues, including exhaustion of administrative remedies followed by direct review of contested cases by this court. *See McKart v. United States*, 395 U.S. 185, 194, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969) (agency should have first chance to apply its expertise); *Dano Resource Recovery, Inc. v. District of Columbia*, 566 A.2d 483, 485 (D.C.1989) (same); *Bender v. District of Columbia Dep't of Employment Servs.*, 562 A.2d 1205, 1208 (D.C.1989) (same); *C Street Tenants Ass'n v. District of Columbia Rental Hous. Comm'n*, 552 A.2d 524, 525 (D.C.1989) (same); K. DAVIS, 4 ADMINISTRATIVE LAW TREATISE § 26:1 (2d ed. 1983).

We conclude, therefore, that the same administrative appeal and review process should apply whether a health care facility seeks a Certificate or attempts to close a service without a Certificate (involving no capital expenditures).

## IV.

■ Although the same rights of reconsideration and review apply whether a party seeks confirmation that a Certificate is not required or submits an application for a Certificate or for an HMO exemption, the regulations apparently contemplate no-

tice to affected persons (by mail) and to the general public (by publication) only as to applications. 22 DCMR § 4201.1 to –.6. The notice provisions and hearing procedures for applications, however, might also appropriately apply to claimed exceptions from the Certificate requirement under D.C.Code § 32–303(f) and 22 DCMR § 4113.6, –.8, thereby permitting a more streamlined review process. That, of course, is for SHPDA to decide in the first instance; but, in any event, notice to affected persons must be assured through clearly announced regulations.

In this case, it is clear that the Coalition was aware of the Hospital's letters to SHPDA claiming the right to close acute inpatient services without a Certificate of Need and that the Coalition received no response from SHPDA to its petition of October 23, 1990. The Coalition filed suit in Superior Court (Case I) on November 5, 1990. Under our analysis, the Coalition chose the wrong avenue for pursuing its complaints. It was aware of SHPDA's decisions, as evidenced by its letter to the Mayor and its petition to the Agency seeking application of the Certificate of Need requirements. Upon receiving no response, the Coalition should have come directly to this court, not to the trial court, seeking an order to compel SHPDA to apply Certificate of Need requirements to the proposed closing of acute inpatient services. See *supra* Part II; *Douglass*, 452 A.2d at 332 (exclusive Court of Appeals jurisdiction to review agency inaction precludes trial court jurisdiction).

We do not know whether under these circumstances, in light of an ambiguous statute and the incomplete regulations at the time, SHPDA would say that its failure to respond to the Coalition's petition— which was properly directed to SHPDA— tolled the period of reconsideration. *See* D.C.Code § 32–308 (1988). Because the record is not sufficient for us to rule definitively, we believe the question whether the Coalition still has a right to proceed administratively is for SHPDA to answer in the first instance, subject to the right of appeal to the Board of Appeals and Review and then to this court.

For lack of trial court jurisdiction we vacate the preliminary injunction issued December 18, 1990 (Case I) and affirm the denial of a preliminary injunction on February 4, 1991 (Case II).

*So ordered.*

WAGNER, Associate Judge, dissenting:

I cannot agree with the court's holding that the Superior Court lacked jurisdiction to entertain an action for injunctive relief under the circumstances presented in Case I.[1] A primary reason for my disagreement with the decision reached by the majority derives from its conclusion that an administrative remedy was available to address the Coalition's grievances. Neither the District of Columbia Certificate of Need Act of 1988, as amended (the Act),[2] nor the regulations implementing it, provides a mechanism for one in the Coalition's position to challenge the failure of the State Health Planning and Development Agency (SHPDA) to require a health care facility (HCF) to obtain a certificate of need (CON) when SHPDA concludes, after notice from the HCF, that no CON is required for the proposed action. The majority seems to recognize these legislative and regulatory omissions. In my view, we cannot fill them, as the decision of the court does, without exceeding our judicial function and intruding into the legislative province. *See West Virginia University Hospitals, Inc. v. Casey,* —— U.S. ——, 111 S.Ct. 1138, 1148, 113 L.Ed.2d 68 (1991).

The Coalition filed an action seeking to compel the Mayor, SHPDA and its director to take steps to require Capitol Hill Hospital and Medlantic Health Care Group (referred to collectively as the Hospital) to comply with the Act by obtaining a certificate of need in connection with the Hospital's plan to close certain medical/surgical services. The trial court concluded that no alternative remedies were available to the Coalition to address its concerns. After an examination of the Act, its legislative history, the local implementing regulations, as well as the Federal Health Planning and Resources Development Act 1979,[3] with which the Act was intended to comply, and the federal regulations for the program, I agree.[4]

The Act requires a certificate of need for a closure only "if it involves a capital expenditure in any amount." D.C.Code § 32–303(f) (1988). The statute by its terms does not mandate prior approval by SHPDA before a closing involving no capital expenditure. The legislative history bears out this point. In a report to the District of Columbia Council by the chairperson of its Committee on Human Services, the following statement appears: "[t]he bill would not require approval of changes in services or capacity not accompanied by a capital expenditure." REPORT TO THE COUNCIL OF THE DISTRICT OF COLUMBIA ON BILL # 3–289, at 3 (the REPORT). The statute contains only a notification requirement by the HCF proposing such action. D.C.Code § 32–303(f) (1988).[5] According to the statute's legislative history, the purpose of the notification

1. I concur in the result reached in Case II. *See Myers v. Bethlehem Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938) (until administrative remedies are exhausted, judicial review is unavailable even where a party claims the administrative body lacks jurisdiction); *see also Bender v. District of Columbia Dep't of Employment Servs.,* 562 A.2d 1205, 1209 (D.C. 1989). Unlike the Coalition, the Hospital had available an administrative remedy.

2. D.C.Code §§ 32–301 to –317 (1988 & 1991 Supp.).

3. 42 U.S.C. § 300m–6 (1980), *repealed by* Pub.L. No. 99–660, 100 Stat. 3799 (1986).

4. In view of the disposition made by the court, discussion of the remaining issues would be advisory only. Therefore, I do not address them.

5. The notification requirement provides:

Any person proposing to permanently close a HCF, health service or HMO shall notify the SHPDA of this intention no later than 90 days prior to the proposed closing, and shall provide the SHPDA such information as the SHPDA shall require by regulation. Such information shall include, but not be limited to, the number of patients to be affected by the closure, the condition of those patients, and provisions being made to provide for their continuing care.

D.C.Code § 32–303(f) (1988).

section, "a SHPDA suggestion," is "to facilitate smooth transitional planning in the face of the closing of a facility or service upon which the community or a segment of the community relies for services." REPORT, at 11.[6] Thus, it does not appear that the notification requirement was intended originally to impose review and approval requirements as a prerequisite to closings involving no capital expenditures.

Nevertheless, SHPDA included in implementing regulations a requirement for information not specifically enumerated in the Act, including a statement that no capital expenditure is involved and the reason for the closure. 22 DCMR § 4113.8(f)(g) (1986). This information, no doubt, assists the agency in monitoring compliance with the Act. However, the provision is not required by statute, nor did SHPDA consider it necessary, apparently, to adopt an application process, notice, hearing, and review procedures for HCF actions excepted under the non-capital expenditure clause. SHPDA can pursue enforcement remedies against individuals who proceed without a certificate of need when required by law, including injunctive relief and criminal penalties. D.C.Code § 32–312 (1988).[7] The availability of these remedies may well have been viewed as sufficient to eliminate the necessity for an administrative process to determine whether a capital expenditure is involved in any closure. If unlawful action is reported to the agency, the agency can investigate and take any steps necessary to bring about compliance. If the offending individual complies and makes application for a CON, administrative remedies become available to affected parties through regulations currently in place. Therefore, it appears that the intention of the legislature and the agency responsible

for implementing the Act is effectuated, rather than frustrated, by an interpretation which recognizes the inapplicability of the application process, notice, hearing and review procedures to proposed actions by HCFs excepted from CON requirements.

Other factors suggest that neither our local legislature nor SHPDA intended that notification requirements under D.C.Code § 32–303(f) (1988), entail procedures for administrative challenges by affected parties. The major focus of the certificate of need law is not upon actions by HCFs which require no capital expenditures. Its purpose is "to promote effective and equitable health planning and regulation of new institutional health services and capital expenditures proposed for the District of Columbia." Id. § 32–301. The Act was "intended to bring the District of Columbia into compliance with the Federal Health Planning and Resources Development Act Amendments of 1979 (P.L. 96–79)." See REPORT, supra, at 1. The certificate of need program as established by the federal statute required review and determination of need only before medical equipment was acquired, institutional health services were offered, or capital expenditures obligated. 42 U.S.C. § 300m–6(a)(1) (1980). Prominent among its features was the requirement that state agencies make decisions upon review of an application for a certificate of need. Similarly, under local law, actions by SHPDA, which trigger a review process which can result in a hearing, an opportunity for reconsideration and appeal by affected parties, are tied to application for a certificate of need or for an exemption for a certificate of need review. D.C.Code §§ 32–303 to –310 (1988 & 1991 Supp.).[8]

Assuming SHPDA had authority to subject to review and challenge by affected

---

6. SHPDA's recommendation for this provision is consistent with its responsibility to provide assistance for orderly transition of patients affected by a closure. Id.

7. Significantly, injunctive relief may be sought by the Corporation Counsel in a "court of competent jurisdiction." D.C.Code § 32–312(b) (1988). The Superior Court, as a court of general jurisdiction, is an appropriate forum for such actions. See D.C.Code § 11–921 (1989); see also Andrade v. Jackson, 401 A.2d 990, 992 (D.C.

1979). The availability of this injunctive remedy in the trial court makes less anomalous the availability of injunctive relief in the Superior Court for aggrieved parties who have no administrative remedy.

8. The "exemption" provisions pertain to HMOs and HCFs proposing certain activities even if capital expenditures are involved. D.C.Code § 32–303(b)(2) (1988); REPORT, supra, at 10. The exemption provisions are not relevant to actions

parties actions of HCFs excepted from coverage by the Act, it adopted *no regulations* to accomplish this purpose. None of the agency's regulations provides for an application, hearing, challenge by affected parties or appeal *from* SHPDA's failure to require an HCF to apply for a certificate of need. SHPDA adopted such regulations for actions which require a certificate of need before an HCF obligates a capital expenditure or takes other action for which a CON is required. 22 DCMR §§ 4201.1 to 4202.11 (1986). Similarly, notice, hearing and an appeal to the Board of Appeals and Review is provided specifically for withdrawal of a certificate of need. *Id.* §§ 4020.9 to 4020.18. Notification requirements and an appeal process are also included for health care facilities obligating $100,000 or more for certain expenses even if "less than the Certificate of Need review threshold." *Id.* §§ 4030.1 to 4030.12. The detailed appeals procedure in chapter 43 of the regulations (22 DCMR §§ 4300.1 to 4313.4) are made expressly applicable to §§ 4030.1 to 4030.13. *Id.* § 4030.13. A letter of intent for closures involving capital expenditures in any amount is subject to a certificate of need which triggers notification, hearing and review procedures set forth in the Act. *Id.* §§ 4113.1, 4300.1 to 4313.4. In contrast, the requirement for notice to the agency of proposed closures for which no certificate of need is required contains no provision for notice to affected persons or procedures for their entry into the appeals process. *Id.* § 4113.8.[9] Since no remedy was provided by statute nor by regulation, I would conclude, as did the trial court, that there were no alternative remedies available to the Coalition when it filed for injunctive relief.

Moreover, before any change in the regulations could be put into affect, under the District of Columbia Administrative Procedure Act (DCAPA),[10] public notice and an opportunity for comment would be required prior to adoption of new rules. D.C.Code § 1–1506 (1987).[11] Post hoc publication of the rules will not render them valid retroactively. *See Rorie v. District of Columbia Dep't of Human Resources,* 403 A.2d 1148, 1152 (D.C.1979).

This court's intrusion into that process imposes upon SHPDA procedures which are not required under the law, which SHPDA had not deemed appropriate to adopt prior to this case, and which have not been adopted in accordance with the local law. It places the Coalition in the position of having new rules applied after successfully litigating its case in the trial court. *See 1880 Columbia Road, N.W., Tenants' Ass'n v. District of Columbia Rental Accommodations Comm'n,* 400 A.2d 333, 338 (D.C.1979) (fundamental unfairness results when "parties who have previously established their legal positions in reliance upon the former regulations would be forced to justify their positions in light of the new regulations"). Therefore, I cannot agree with the decision of the court vacating the trial court's decision in Case I for lack of jurisdiction.

by HCFs excepted from obtaining a certificate of need.

**9.** The only action expressly provided for after notification of intended actions for which no CON is required is for SHPDA to coordinate, to the extent feasible, orderly transition of patient care. 22 DCMR § 4113.9 (1986). This is consistent with the legislative purpose.

**10.** D.C.Code §§ 1–1501 to –1542 (1987 & 1991 Supp.).

**11.** The federal regulations which governed certificate of need programs required the state agency to provide an opportunity for written comment by interested persons before proce-

dures could be adopted. *See* State Health Planning and Development Agencies, 45 Fed.Reg. 20034, 20039 (1980) (originally codified at 42 C.F.R. § 123.409; has been removed from C.F.R. *See* 42 C.F.R. at 183). The state agency's review procedures were required to include, *inter alia,* timely notification to affected persons of the beginning of the review period, a public hearing, if requested by any affected person, including a verbatim record of the proceedings, public hearings for reconsideration of the agency's decision, and administrative review procedures. 45 Fed.Reg. at 20039—20041 (originally codified at 42 C.F.R. §§ 123.410(a)(2), (a)(8), (a)(11), (a)(13)).